No. 104,998

STATE OF KANSAS, *Appellee*, v. MIGUEL A. GARCIA, *Appellant*.

(301 P.3d 658)

Opinion filed April 26, 2013.

*Debra J. Wilson*, of Capital Appeals and Conflicts Office, argued the cause and was on the briefs for appellant.

*Jodi E. Litfin*, assistant district attorney, argued the cause, and *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: A jury convicted Miguel A. Garcia of felony murder based upon the underlying felony of aggravated robbery, for which he was also convicted. During the robbery, Eliel Fernandez shot and killed the robbery victim, Andres Vega. Garcia's guilt was premised upon his alleged participation in the planning and execution of the robbery. During a police interrogation, Garcia admitted that he participated in the robbery, and the district court denied Garcia's motion to suppress that statement. On appeal, Garcia contends: (1) The district court should have suppressed as involuntary the confession elicited from him during an interrogation; (2) the district court erred in finding that he had opened the door for the State to use the rebuttal testimony of a previously excluded witness; (3) the district court erroneously admitted repetitive and overly gruesome photographs where the manner and cause of death were not in issue; and (4) the cumulative effect of trial errors denied him a fair trial. Finding that Garcia's confession was improperly obtained, we reverse and remand for a new trial.

## Factual and Procedural Overview

The incident giving rise to the charges in this case occurred the evening of February 21, 2009, in the parking lot of a bar. The witnesses' descriptions of the events that evening contained inconsistent details, especially as to the persons who participated in the planning of the robbery and as to when and where the decision to rob someone was made. But, generally, we know that Garcia left the home of his girlfriend, Eman Malkawi, and proceeded to the bar in the company of Malkawi, Tina Buck, and Eliel Fernandez. There was some disputed testimony that Garcia participated in a pre-departure discussion about robbing a bar patron.

While the group was at the bar, employees discovered that Fernandez was not in possession of proper identification, and they asked him to leave. Fernandez left with Garcia and Malkawi to go to his residence to retrieve an ID card. Ostensibly, as he was leaving the bar Fernandez told Buck to find someone for them to rob and to lure that person outside. At his house, Fernandez obtained a weapon which he took along as he, Malkawi, and Garcia drove back to the bar. Upon arriving at the bar parking lot, the three saw Buck with a man, later identified as Vega. Fernandez and Garcia exited the car and ran toward Buck and Vega. As they ran, Fernandez pulled out the gun and yelled: " 'Give me your money, bitch!' " Garcia attempted to prevent Fernandez from shooting Vega, but Garcia got shot in the foot for his efforts. Fernandez then shot at Vega, striking him with four rounds and causing his death.

Garcia, Fernandez, and Malkawi left the bar immediately after the shooting. Garcia and Malkawi let Fernandez out of the car to dispose of the gun and then proceeded to Buck's mother's house, where Garcia's gunshot wound was cleaned with peroxide and bandaged. Garcia and Malkawi returned to their home without obtaining any further medical assistance for Garcia's gunshot wound.

The next morning, police officers brought Garcia and Malkawi to the station, where they were separately questioned. After being read his *Miranda* rights, Garcia signed a written waiver of those rights. Garcia's interview was videotaped and lasted a total of 5

hours, although the actual questioning occurred in segments and consumed a total time of something less than 2 hours.

Details of the interrogation will be recited in the discussion of the suppression issue, so a brief summary will suffice here. Initially, Garcia denied that he knew Fernandez or that he was involved in any robbery. He subsequently admitted knowing Fernandez and acknowledged that he was at the scene of the shooting. But for most of the interview he continued to deny any involvement in the robbery. Instead, Garcia's version of events was that he tried to intervene when he saw Vega attempting to abduct Buck into a van, but someone began shooting and wounded Garcia, prompting him to flee the scene. During the interview, Garcia requested medical attention a number of times, but the officers said that he would have to wait for medical treatment or pain medication until the interrogation was complete and Garcia had done "what you know is the right thing to do." The law enforcement officers refused to accept that Garcia was rescuing Buck and repeatedly urged him to admit to participating in the robbery and to be a witness against Fernandez, the shooter, in order to avoid being charged with felony murder. At one point, an officer told Garcia that the district attorney was present outside of the interrogation room. The interrogating officer initially refused Garcia's request to see his girlfriend, Malkawi, saying that Garcia first needed to tell the truth about what happened in his own words. When Garcia would not give that statement, the officer brought Malkawi into the interrogation room to tell Garcia that he would not be booked for murder if he admitted to the robbery. Garcia immediately admitted to participating in the robbery, albeit he provided no details on how the robbery was planned or executed. The interview concluded shortly thereafter, and Garcia was booked into jail on charges of both felony murder and robbery.

Prior to trial, the court conducted a hearing on Garcia's motion to suppress his confession. The State relied entirely on the digital videotape of the interrogation and the transcript of that interview. After reviewing those exhibits, the trial court found that Garcia had been given the *Miranda* warnings; that Garcia appeared to be in some pain at times, but not "acute pain"; that Garcia did not appear

to believe the police officer's promises that he would only be charged with robbery if he confessed to that crime; and that from the totality of the circumstances, Garcia's statement was voluntary.

At trial, Garcia took the witness stand in his own defense and denied any involvement in the planning or execution of the robbery. Garcia claimed that he only confessed to the robbery based upon the promise, related by the police and Malkawi, that he would not be charged with murder if he admitted to the robbery. The jury convicted Garcia of conspiracy to commit robbery and first-degree felony murder.

## SUPPRESSION OF CONFESSION

Garcia contends that the district court erred in finding that the totality of the circumstances established that his confession to participating in the robbery was freely and voluntarily given. He emphasizes two circumstances that gainsay voluntariness: (1) The interrogating officers withheld requested medical treatment and pain medication for Garcia's gunshot wound until the interrogation was completed; and (2) the State used promises of leniency to induce the confession. We agree with Garcia; the manner in which his ultimate confession to robbery was obtained was unconstitutionally infirm.

### Standard of Review

This court has observed that a district court's ruling on a motion to suppress evidence usually presents a mixed question of fact and law, prompting the use of a dual standard of review. The facts underlying the district court's decision on a suppression motion are reviewed under a substantial competent evidence standard, but the ultimate legal conclusion to be drawn from those facts is reviewed de novo. *State v. Summers*, 293 Kan. 819, 825, 272 P.3d 1 (2012). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *State v. Schultz*, 289 Kan. 334, 340, 212 P.3d 150 (2009). But appellate courts should refrain from reweighing evidence, assessing witness credibility, or resolving conflicts in the evidence applicable to the district court's ruling on a motion to

suppress. See *State v. Robinson*, 293 Kan. 1002, 1017, 270 P.3d 1183 (2012); *State v. Cosby*, 285 Kan. 230, 240, 169 P.3d 1128 (2007); *State v. Swanigan*, 279 Kan. 18, 23, 106 P.3d 39 (2005).

Notwithstanding our well-settled law on the standard of review applicable to a suppression ruling, Garcia asks us to utilize a de novo review, omitting any deference to the district court's factual findings. Garcia contends that the change is justified because the entire police interview at issue here was videotaped and transcribed, allowing this court to see exactly what the trial judge saw. He argues that both this court and the Court of Appeals have exercised de novo review "[u]nder similar circumstances."

A review of the cases cited by Garcia, however, does not reveal the suggested similarity in circumstances. To the contrary, this court has routinely utilized its bifurcated standard of review in suppression cases, even where the statements at issue were videotaped. See *Robinson*, 293 Kan. at 1017; *State v. Gonzalez*, 282 Kan. 73, 100, 145 P.3d 18 (2006); *State v. Ackward*, 281 Kan. 2, 8, 128 P.3d 382 (2006); *State v. Combs*, 280 Kan. 45, 47, 118 P.3d 1259 (2005); *State v. Holmes*, 278 Kan. 603, 611-12, 102 P.3d 406 (2004); *State v. Jackson*, 270 Kan. 755, 756-57, 19 P.3d 121 (2001). Moreover, although this court provided no separate analysis of the issue, in *State v. Edwards*, 291 Kan. 532, 545, 243 P.3d 683 (2010), we rejected a defendant's assertion that we should perform a de novo review of a trial court's denial of a motion to suppress.

Granted, we have held that where the facts material to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law subject to unlimited review. *State v. Fitzgerald*, 286 Kan. 1124, 1126, 192 P.3d 171 (2008). One can imagine that the videotaping of an interrogation might greatly reduce the number of facts that are disputed; it nevertheless remains the duty of the district court to do the factfinding, not the appellate courts. As our Court of Appeals has aptly observed, "[A]lthough we may consider whether a videotape of a traffic stop supports the district court's factual findings, we do not review the videotape in an effort to invade the district court's province of determining witness credibility or weighing the evidence." *State v. Diaz-Ruiz*, 42 Kan. App. 2d 325,

329, 211 P.3d 836 (2009). See *State v. Hess*, 37 Kan. App. 2d 188, 191, 153 P.3d 557 (2006). That same procedure is appropriate where the videotape involves an interrogation. Accordingly, we decline Garcia's invitation to modify our standard of review.

*Analysis*

We begin with a review of some basic principles. The State has the burden to prove, by a preponderance of the evidence, that a defendant's statements were voluntarily made, *i.e.*, that the statements were the product of the defendant's free and independent will. See *State v. Gilliland*, 294 Kan. 519, 529, 276 P.3d 165 (2012); *Edwards*, 291 Kan. 532, Syl. ¶ 5; *State v. Brown*, 286 Kan. 170, 172, 182 P.3d 1205 (2008). The court looks at the totality of the circumstances surrounding the statement and determines whether it was voluntary. Appellate courts have developed a nonexclusive list of factors to aid in the voluntariness analysis:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *Robinson*, 293 Kan. 1002, Syl. ¶ 7.

These factors, even if established as true, do not necessarily conclusively establish that the confession was involuntary. Moreover, the process is not one of simply listing and comparing those factors favoring voluntariness and those factors indicating involuntariness.

" '[T]hese [voluntariness] factors are not to be weighed against one another on a balance scale, with those favorable to a free and voluntary confession offsetting those tending to the contrary. Instead, the situation surrounding the giving of a confession may dissipate the import of an individual factor that might otherwise have a coercive effect. [Citation omitted.] Even after analyzing such dilution, if any, a single factor or a combination of factors considered together may inevitably lead to a conclusion that under the totality of circumstances a suspect's will was overborne and the confession was not therefore a free and voluntary act.' " *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009) (quoting *Green v. Scully*, 850 F.2d 894, 902 [2d Cir. 1988]).

In addition to the caselaw on voluntariness, we have a hearsay exception for confessions that sets forth some constraints on the

admissibility of an accused's statements that may be helpful in this case:

"In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged [is admissible], but only if the judge finds that the accused (1) when making the statement was conscious and was capable of understanding what the accused said and did and (2) was not induced to make the statement (A) under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same." K.S.A. 2012 Supp. 60-460(f).

Garcia does not contend that the district court failed to follow the foregoing directions. To the contrary, the district court specifically recited the correct legal standards and generally discussed the nonexclusive factors.

With respect to Garcia's mental condition, the court focused on the impact of the gunshot wound and its accompanying pain. The court noted that, most often, Garcia focused on the pain from his wound during the periods when he was alone in the interrogation room. But during the periods of actual interrogation, the court found Garcia to be alert and focused, asking appropriate questions and giving appropriate answers. The court opined that, although there were times that Garcia asked for medical attention and times when he exhibited pain during the interrogation periods, "Garcia's pain was [not] so acute during the interviews that it appeared to be uppermost in his mind or that it affected the content of his statements."

The district court characterized the duration and manner of interrogation as follows:

"Mr. Garcia was in the interview room about five hours; however actual interviews of Mr. Garcia lasted a total of less than two hours off and on. Mr. Garcia was given water and was allowed access to a restroom when he requested one. At times law enforcement raised their voices and expressed opinions about what they believed to be true. Law enforcement showed dissatisfaction through words and actions when Mr. Garcia's statements did not seem consistent with their idea of the truth. The detectives did express the belief that charges would be less serious if Mr. Garcia cooperated. It is clear what the detectives believed cooperation

would be. Nonetheless, law enforcement stopped short of promising benefit or detriment to Mr. Garcia that was connected to what Mr. Garcia said."

On the factor of the accused's ability to communicate with the outside world, the district court suggested that Garcia only made two requests: (1) to visit with his girlfriend, Malkawi; and (2) to get medical attention for his injury. The court then summarily dismissed that factor with its finding that "[a]ccess to his girlfriend was granted within a short time, and the defendant was taken to the hospital after the interview."

With respect to the fourth factor—the accused's age, intellect, and background—the district court recited that Garcia was 29 years old with apparently average intellect. The court noted that Garcia had related that he had been imprisoned in California and that Garcia appeared to be adept at deflecting the "conversation from areas of inquiry that might be most harmful to him legally."

The district court expressed some concern about the fairness of the officers conducting the interrogation. The court noted that when the officers believed that Garcia was not being truthful, they would immediately cut him off, raise their voices, and say that things would go better for Garcia if he admitted to participating in the robbery. Further, the officers' statements of the law were "sometimes wrong." But the court balanced that against one officer's statement that it would be the district attorney who decided what to charge and the court's opinion that Garcia did not believe that the officers had the authority to determine what he would be charged with or that they were telling him the truth.

After determining that the last factor—English fluency—was not in issue, the district court concluded that, under the totality of the circumstances, Garcia's statements were voluntary. Accordingly, the court denied the suppression motion.

We turn now to Garcia's specific complaint that the officers denied him medical treatment for the purpose of inducing a confession. The district court considered Garcia's gunshot wound and accompanying pain only as it related to his ability to lucidly communicate with the law enforcement officers. In that regard, the district court was willing to accept the fact that Garcia was in pain,

so long as the pain was not so acute as to affect his ability to know what he was doing or saying. But a *knowing* confession is not a *voluntary* confession if it is coerced, *i.e.*, if it is not the product of free will. The inquiry, then, is whether the officers' withholding of medical treatment influenced Garcia's decision to confess to the robbery. If law enforcement officers make an accused endure pain, even less than debilitating pain, until the accused gives a statement that the officers will accept, the voluntariness of that confession is, at best, suspect. The record indicates that was the circumstance here.

As previously noted, Garcia requested medical treatment within the first half hour of his detention. The detective responded, "Give me a couple minutes," and said he just wanted to know who was with Garcia on the night of the incident. When Garcia cursed at his pain, the detective responded by saying that Garcia should "hang on, just give me about five seconds here and answer this question." But after Garcia answered that question, the detective continued with 18 more questions before asking: "You need something, you want somebody to take a look at that?" Although Garcia answered in the affirmative, the detective left the interrogation room and returned to resume questioning without providing pain medication or medical treatment. Shortly thereafter, the detective asked why Garcia had not gone to the doctor after being shot, to which Garcia responded that he "was just paranoid, sir, to be honest with you." A little later, the detective asked if the bullet was still in Garcia's body and inquired as to whether there was one hole or two. Although Garcia's response was equivocal, the detective moved right back to questioning before leaving the room again.

The interrogation resumed with another law enforcement officer, who introduced himself to Garcia before inquiring about his foot. But the questioning continued for awhile before the officer inquired whether Garcia's foot had an exit wound, *i.e.*, whether the bullet was still in the foot. The officer then said that he was "going to be really interested when we take you to the hospital whether we're going to find out that that bullet does down or this way." Later, the officer told Garcia that he knew the bullet in Garcia's foot would match the bullets in the dead victim. In other words,

the officer was suggesting that Garcia's medical treatment would be part of the criminal investigation and the implication was that they would not go to the hospital until the interrogation was completed.

The officer sparred with Garcia for a long time, indicating that Garcia's version of what happened was not matching up with what the police already knew from other witnesses. The officer suggested that if Garcia was not the shooter and he told what had happened, he could avoid going to prison on a murder charge. The officer related some scenarios whereby a person could avoid being charged with felony murder, even though the person had participated in a felony where an accomplice killed someone. Presumably, this part of the interview contributed to the district court's finding that the officers' statements of the law were "sometimes wrong." Nevertheless, Garcia kept saying that he would not admit to something that he did not do and that he knew he would be charged with murder no matter what. At one point, he said he would just go to court and fight the charges, and at another point he expressed his belief that he would be killed in prison if he told the officer anything more than what he had said. Perhaps the flavor of the interrogation might be captured in the following statement by the officer, after Garcia had indicated that he thought he would be sent to prison for 25 years to life:

"Do something about it. I've told you, I am giving you the tools to take care of this, to help yourself. I've given you the information that you need to know. I have tried to pull it out of you and I am not getting anywhere with you. I'm saying, help yourself. Help yourself."

Garcia continued to express skepticism at the officer's suggestion that he could avoid a murder charge by admitting to involvement in the robbery and eventually asked if he could get some medical attention. When the officer ignored the request and continued with the interrogation, the conversation went as follows:

"[Garcia:] Can I get some medical attention?
"[Officer:] After we're done.
"[Garcia:] This is hurting bad.
"[Officer:] You know what? It was hurting before and you didn't go to the hospital, at all, did you? It's not bothering you that bad. I know it hurts. I know

it hurts. It's not bothering you bad enough that you wanted to go to the hospital and risk having to run into the police there. So, let's get this out of the way, do what you know is right, do what you know is the right thing to do, do what's good for Miguel.

"[Garcia:] I am.

"[Officer:] No, you're not. You're not giving me any choice. Given a choice between having Miguel as a witness or as a guy sitting next to the guy that's going away for the rest of his life, I would rather have you as a witness; but that's a choice that you got to help me make."

A discussion ensued about what deal the district attorney (DA) might make with Garcia, and the officer said, "The DA's in the other room." When Garcia asked to see his girlfriend, Malkawi, the officer responded that he was "not going to let that happen until we finish talking." After Garcia asked for some water, the interrogating officer left the room. When the officer returned, there was no more talk of medical attention. Instead, the attempt to persuade Garcia to admit to participating in the robbery resumed in earnest.

We discern that certain things are patently obvious from the words and actions of the law enforcement officers conducting Garcia's interrogation. First, the officers knew that Garcia had been shot in the foot with a firearm; that he probably still had the bullet inside his body; that he had not received professional medical treatment for the wound; and that he was experiencing pain from the injury at the time of the interrogation. Next, Garcia was not going to be provided any medical attention or pain relieving medication until the officers had completed their questioning and took him to the hospital to retrieve the bullet for evidence. Further, the officers appeared unlikely to complete their questioning until Garcia gave them the statement that they believed to be true, which was that Garcia participated in the robbery.

The State contends that other facts are compelling, such as Garcia's choosing not to go to the hospital with his gunshot wound and his statements that he did not feel anything in his foot. Any suggestion that those facts are relevant to the level of pain that Garcia was suffering during the interrogation would be disingenuous. Garcia's failure to seek immediate care from a physician is certainly understandable, given the general knowledge that doctors have to

report gunshot wounds to the police. See K.S.A. 2012 Supp. 21-6319 (unlawful for attending physician to fail to report gunshot wound to chief of police or sheriff). Garcia's statements about not feeling anything were related to the questions as to whether the bullet remained in the foot. Not being able to feel whether the bullet remained in the foot does not mean an absence of pain.

By the time Garcia ultimately confessed, he had been in police custody for approximately 5 hours. Remembering the district court opined that Garcia appeared to be most bothered by the pain during the times he was alone in the interrogation room and the actual questioning took less than 2 hours, we can calculate that Garcia had endured over 3 hours of the more painful periods at the time of the confession. Garcia appeared to unsuccessfully attempt a number of ploys to bring the interrogation to an end, such as saying that he would just fight the charges in court or that if he gave them the statement they wanted he would be killed in prison as a snitch. At one point a little over halfway through the interrogation detention, he even said straight out: "You say I am arrested already so I might as well just go along." But the interrogation continued.

Even for an accused with Garcia's prior experience with the legal system, the withholding of medical attention until the completion of the interrogation had to influence the ultimate decision to tell the police what they were asking to be told. Even if Garcia did not confess solely to obtain medical treatment, the tactic of withholding requested relief for an obviously painful untreated gunshot wound over the course of a several-hours-long interrogation was inherently coercive and must play a significant role in our totality-of-the-circumstances test. Indeed, one of the purposes of the exclusionary rule is to prevent inhumane and unacceptable interrogation techniques.

Moving to Garcia's second point—that he was promised leniency in return for a confession to robbery—we are constrained to some extent by the district court's finding that "law enforcement stopped short of promising benefit or detriment to Mr. Garcia that was connected to what Mr. Garcia said." Although the law enforcement officers for the most part chose their words carefully, an ordinary person would have understood that the officers were telling the

accused that a murder charge and accompanying life sentence could be avoided by admitting to the robbery and testifying against Fernandez. It appears that Garcia refused to take the bait because he thought it was a trick, not because he did not understand that the promise was being made.

Nevertheless, we can steer clear of the district court's factfinding province. That court did not discuss the portion of the interrogation involving Malkawi, immediately before Garcia confessed. As noted above, the interrogating officers had denied Garcia's request to see his girlfriend, indicating that he would have to give his statement first. But when repeated efforts at obtaining the desired statement failed, the officer switched tactics:

"[Sergeant Volle:] No. No. Come on. Would I be doubting you at all if I didn't know it was not true? I know what happened. Hang on, I am going to go get your girl. She's going to stand at that door, you are going to sit in that chair.

"[Garcia:] Yeah.

"[Sergeant Volle:] Don't move; no hugs.

"[Garcia:] I know, I know. I'll probably do that, I am not—

"[Sergeant Volle:] She is going to stand in that door and she is going to tell you that I talked to her and she told the truth.

"[Garcia:] Okay.

"(Sergeant leaves room and then returns with unidentified female)

"[Malkawi:] Right here?

"[Sergeant Volle:] Yeah, right here.

"[Malkawi:] Do you want to go in for murder or robbery?

"[Garcia:] I'm fuckin' pretty sure (Inaudible). You know that.

"[Malkawi:] Baby, at least don't go down for murder.

"[Garcia:] But I didn't even do shit.

. . . .

"[Sergeant Volle:] Go ahead, explain to him. Help me help him.

"[Malkawi:] They are going to take you down for murder if you don't—if you don't say about the—

"[Garcia:] I know they are going to take me down for murder, (Inaudible) for fuckin' robbery, all of this, because they are going to book both on me later on when I get to the fuckin' station.

"[Malkawi:] They're not going to book you for murder.

"[Garcia:] All right, man, I did, I did try to rob that guy.

"[Malkawi:] But he didn't—he really did, he really tried to stop him. He tried to stop him from shooting the guy. He really did."

Law enforcement coercion can be mental as well as physical. *State v. Harris*, 284 Kan. 560, 579, 162 P.3d 28 (2007). It is well

settled that an extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. 284 Kan. at 579. In order to render a confession involuntary as a product of a promise of some benefit to the accused, including leniency, the promise must concern action to be taken by a public official; it must be such that it would likely cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believed had the power or authority to execute it. 284 Kan. at 579-58. Moreover, there must be a link between the State's coercive conduct and the confession. *Swanigan*, 279 Kan. at 40.

The foregoing exchange did not stop short of promising a benefit to Garcia in return for his confession to robbery. The promised benefit was clearly stated: "They're not going to book you for murder." That was the same carrot that the officers had been unsuccessfully dangling in front of Garcia for hours. But this time, it was delivered by someone that Garcia trusted, and the result was immediate: "All right, man, I did, I did try to rob that guy."

The promise concerned action to be taken by a public official, *i.e.*, the law enforcement officer who would process Garcia into jail. The promise was one that would likely cause the accused to make a false statement to obtain the promised benefit, *i.e.*, the ability to make a murder charge and accompanying life sentence go away would be a strong motivator for prevarication. Finally, although the promise was verbalized by Malkawi, she was obviously referring to the conduct of the police. Sergeant Volle told Garcia that he had talked with Malkawi and then he brought her into the interrogation room, imploring her: "Go ahead, explain to him. Help me help him." After Malkawi stated that "they" were not going to book Garcia for murder, the sergeant did not correct the statement. To the contrary, after Malkawi left the room, he pointed out to Garcia that he had been telling the truth all along. Regardless of whether the DA had made a charging decision, the arresting officer clearly had the apparent authority to fulfill the promise not to book Garcia for murder. In short, the promise in this case fits within the

parameters of those promises that may be deemed to have rendered a confession involuntary.

As noted above, after we give deference to the district court's findings of fact, we exercise de novo review of the totality of the circumstances to determine whether the confession was voluntarily given. In that regard, we disagree with the district court's legal conclusion. The law enforcement officers' coercive tactics and promises of leniency, in the context of the circumstances of the entire interrogation, convince us that the confession here was not a product of the accused's free will, *i.e.*, was not voluntary. Accordingly, we find that the district court erred in refusing to suppress the defendant's confession.

Nevertheless, even an error that infringes upon a constitutional right may be declared harmless if the benefiting party proves beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). But here, the State's brief simply argued that the admission of the confession was not erroneous; no attempt was made to convince us that the admitted confession did not contribute to the verdict. See *State v. McCaslin*, 291 Kan. 697, 709, 245 P.3d 1030 (2011) (issue not briefed deemed waived and abandoned). Even so, such a task would have taken a Herculean effort. Garcia's own statement that he did the robbery was tantamount to admitting that he committed felony murder, which would have to be compelling for a jury. Consequently, we cannot declare the error to be harmless; rather, we must reverse Garcia's convictions and remand for a new trial.

Given our disposition on the first issue, we need not discuss the remaining issues in detail. We would caution, however, that the coroner or medical expert is not the gatekeeper with respect to the relevancy of photographs, especially those that have been rendered more gruesome by the autopsy procedure. Just because the coroner *could* use a photograph to explain the victim's anatomy, the trial court must nevertheless ascertain that the photograph's pro-

bative value to the prosecution of the case outweighs its prejudicial effect.

Reversed and remanded.