NOT DESIGNATED FOR PUBLICATION

No. 112,831

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSE M. ARRIAGA,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed March 11, 2016. Affirmed in part and dismissed in part.

*Heather Cessna*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., SCHROEDER, J., and BURGESS, S.J.

*Per Curiam*:  Jose M. Arriaga appeals his conviction for aggravated assault in Sedgwick County District Court. Arriaga contends that the district court erred in refusing to suppress his statements to police in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), that the court erred in refusing to provide the jury with a multiple-acts unanimity instruction, and that the imposition of the aggravated penalty within the applicable sentencing grid violated his right to due process as stated in *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007). We affirm in part and dismiss in part.

1

Arriaga and Ineida Samano had a tumultuous, 4-year relationship. At times, they lived together, holding themselves out to the community as a married couple. In March 2013, they had separated, and Samano had moved back into her mother's house. Samano's mother lived down the street from Arriaga.

On the evening of March 21, 2013, Samano made plans with a friend, Wendy Perez, to look at some clothes at Perez' house. Perez and a male friend, known only as Ezekial, stopped by Samano's house to pick her up. Ezekial was driving his truck.

Earlier in the evening, Arriaga had sent a text message to Samano asking if he could take her out for dinner. Samano had told him that she had already eaten and planned to stay at her mother's house. Suspecting that Samano was seeing another man, Arriaga picked up some food and ate it in his car outside his home so that he could watch Samano's residence.

When Samano left the house and got into Ezekial's truck, she saw Arriaga watching her. As they drove away, Samano instructed Ezekial to turn down a side street, hoping to lose Arriaga. Arriaga followed and caught up with them as they were delayed by traffic at a controlled intersection. As Ezekial pulled his truck into the intersection after stopping at the stop sign, Arriaga lightly bumped the truck with his car. The occupants of the truck thought that Arriaga simply did not stop his car quickly enough and continued towards Perez' house.

Arriaga continued to follow and to bump Ezekial's truck, worrying its passengers. He also sent text messages to Samano, telling her to get out of the truck. After Ezekial turned onto westbound Kellogg Avenue, Arriaga eventually pulled ahead of the truck. Both vehicles were traveling under the posted speed limit. Because Arriaga was ahead of

2

them, Ezekial decided to take the Hillside exit, again hoping to lose Arriaga. Realizing that the truck had taken the exit, Arriaga pulled his car off the road and crossed some grass to the exit in order to position himself once again behind Ezekial's truck.

Frightened, Samano called the police as Ezekial turned around on Hillside and returned to Kellogg. He drove the truck east on Kellogg, followed by Arriaga. Fed up with the situation, Ezekial finally pulled his truck onto the shoulder and climbed out of the truck to confront Arriaga. Arriaga pulled just ahead of the truck a few feet. Rather than getting out of his car, however, Arriaga reversed his car into the truck and then drove away. When Arriaga backed into the truck, the occupants, Samano and Perez, were afraid they would be injured. After Arriaga left, Ezekial returned to the truck and drove to a nearby QuikTrip store, where they met the police. The police asked the occupants of the truck to go to a nearby police station to file a report, and they complied.

Arriaga was interviewed by police after his arrest on March 22. After asking some personal and background questions, the detective read Arriaga his *Miranda* rights while Arriaga followed along on a written form, which he initialed as the detective informed him of his rights. Afterwards, Arriaga consented to speak with the detective and provided some inculpatory statements.

The State charged Arriaga with one count of aggravated assault. Arriaga waived a preliminary examination. Following the State's motion for a *Jackson v. Denno* hearing to determine the voluntariness of Arriaga's incriminating statements, see *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), Arriaga filed three motions seeking to suppress his statements to police on various grounds.

On December 16, 2013, the first day of trial, the district court held a hearing on the motions. The court ultimately concluded that the statements were voluntary and that the pre-*Miranda* statements were not the product of a custodial interrogation. The district

3

court denied the motions to suppress. The jury heard evidence on December 17 but adjourned for the evening before beginning deliberations. The following morning, the jury convicted Arriaga of aggravated assault. Answering a special verdict question, the jury found that the crime involved domestic violence.

On January 30, 2014, the district court sentenced Arriaga to an underlying prison term of 14 months, the aggravated penalty within the applicable sentencing grid based on Arriaga's criminal history score of H and the severity level 7 assigned to aggravated assault. The district court suspended the sentence in favor of the presumptive 24-month probation term. The following day, Arriaga filed his notice of appeal.

### DID THE DISTRICT COURT ERR IN FAILING TO SUPPRESS ARRIAGA'S STATEMENT TO POLICE?

Arriaga first contends that the district court erred in refusing to suppress both his pre-*Miranda* statements to police as products of a custodial interrogation and his post-*Miranda* statements as products of the earlier tainted statements. As Arriaga notes, this court reviews suppression rulings under a bifurcated standard. The reviewing court will adopt the factual findings by the district court that are supported by substantial competent evidence, but the ultimate legal conclusion regarding suppression is subject to plenary review. See *State v. Garcia*, 297 Kan. 182, 186, 301 P.3d 658 (2013); *State v. Gilliland*, 294 Kan. 519, 545, 276 P.3d 165 (2012), *cert. denied* 133 S. Ct. 1274 (2013). Although Arriaga's interview with the police was recorded and the recording is incorporated into the record on appeal, the court's deference to factual findings by the district court does not change. See *Garcia*, 297 Kan. at 187 ("[T]his court has routinely utilized its bifurcated standard of review in suppression cases, even where the statements at issue were videotaped.").

4

*Pre-Miranda Statements*

Arriaga first argues that he was subjected to custodial interrogation before he was warned of his constitutional rights in violation of *Miranda*. Law enforcement officers are not required to provide every person they question *Miranda* warnings before conducting the questioning but only to persons subject to custodial interrogation. *Miranda*, 384 U.S. at 444; *State v. Warrior*, 294 Kan. 484, 496, 277 P.3d 1111 (2012).

As stated in *Miranda*, "custody"—for purposes of triggering the procedural safeguard of informing a person of their constitutional Fifth and Sixth Amendment rights—occurs when an individual has been formally arrested or otherwise been deprived of freedom of action in a significant manner. 384 U.S. at 444, 478-79. The ultimate inquiry is whether a reasonable person in the position of the defendant would have felt free to terminate the interrogation and disengage himself or herself from the encounter. See *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 128 L. Ed. 2d 293 (1994) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officer or the person being questioned."); *Warrior*, 294 Kan. at 497.

Though Kansas courts generally consider eight factors in determining whether an interrogation was custodial or merely investigative, see *Warrior*, 294 Kan. at 496, it is unnecessary to consider the factors in this case because Arriaga was clearly in custody within the meaning of *Miranda*. He had been arrested and was handcuffed to the table in the interview room both before the interview began and after it ended. Detective Naldoza admitted that Arriaga was in custody and was not free to leave.

The suppression ruling regarding Arriaga's pre-*Miranda* statements, therefore, hinges on whether the questions asked of him before he was given the warnings

5

constituted interrogation. As used in the context of *Miranda*, an interrogation occurs "whenever a person in custody is subjected to either express questioning or its functional equivalent in the form of 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Garcia*, 233 Kan. 589, 603, 664 P.2d 1343 (1983) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 [1980]).

In *Garcia,* a suspect was provided with *Miranda* warnings, and he invoked his right to counsel. Nevertheless, the detective asked the suspect to answer questions regarding personal background information. Reviewing existing caselaw on the subject, the Kansas Supreme Court determined that the collection of routine personal biographical information from a suspect does not constitute an interrogation within the meaning of *Miranda*:

"The information obtained from the appellant to complete the personal history sheet following his request for counsel did not violate his rights against self-incrimination and right to counsel under *Miranda*. The personal background questions did not constitute an 'interrogation' within the meaning of *Miranda* and *Innis*. The trial court did not err in admitting the personal history sheet and Detective Milham's testimony into evidence." *Garcia*, 233 Kan. at 607.

Important to the resolution of the case was the court's finding that none of the personal biographical and background questions related to the crime charged or the suspect's involvement in that crime. The court admitted that the booking questions requested a description of Garcia's vehicle—which matched the description of a vehicle seen leaving the victim's house—but found that even this question did not constitute interrogation because the description of the car was not incriminating due to the undisputed nature of the defendant's identity as the perpetrator of the crime and because the questions were not asked of Garcia to obtain an incriminating response. 233 Kan. at 606-07.

Despite the intervening United States Supreme Court decision of *Pennsylvania v. Muniz*, 496 U.S. 582, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990), no published Kansas appellate decision has revisited *Garcia*. See *State v. Appleby*, 289 Kan. 1017, 1051-52, 221 P.3d 525 (2009) (acknowledging *Muniz* without mentioning *Garcia*); *State v. Thompkins*, 271 Kan. 324, 333-34, 21 P.3d 997 (2001) (citing *Garcia* with approval in determining whether a prosecutor's comments on a suspect's refusal to answer personal background questions constituted an impermissible comment on the suspect's right to remain silent); *State v. Carter*, No. 95,576, 2007 WL 959617, at *5 (Kan. App. 2007) (unpublished opinion) (stating that the holding in *Garcia* is consistent with the holding of *Muniz* in finding an exception to custodial interrogation for routine booking questions), *rev. denied* 284 Kan. 947 (2007); *State v. Jackson*, No. 94,440, 2006 WL 2337231, at *6 (Kan. App. 2006) (citing *Garcia* for the proposition that routine background questions did not constitute interrogation within the meaning of *Miranda* without discussing *Muniz*), *rev. denied* 282 Kan. 794 (2006).

*Muniz* was a plurality decision. With respect to Part III-C of the court's opinion—holding that routine booking questions involving personal, identifying information constituted an exception to *Miranda*—only four Justices joined in the opinion:  Brennan, O'Connor, Scalia, and Kennedy. *Muniz*, 496 U.S. at 600-02. Four others—Chief Justice Rehnquist, and Justices White, Blackmun, and Stevens— concluded that none of the challenged questions required suppression because the responses they elicited were nontestimonial, and the Court was not required to consider whether the questions fell into an exception to *Miranda*. *Muniz*, 496 U.S. at 606-08. Therefore, the Court reached a majority decision only in the result. Accordingly, the statement by this court in *Carter* might more accurately state that the reasoning in *Garcia* is not *inconsistent* with (rather than consistent with) the reasoning of *Muniz*. Since *Garcia* does not conflict with any contrary authority of the United States Supreme Court, this court remains bound to follow *Garcia*. See *State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976) (recognizing that the reasoning in its prior decision had been rejected and overruled by the United States

7

Supreme Court in *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 [1976]); *State v. Belone*, 51 Kan. App. 2d 179, 211, 343 P.3d 128 (Court of Appeals bound to follow Kansas Supreme Court precedent), *rev. denied* 302 Kan. ___ (September 14, 2015).

Applying *Garcia*, however, does not necessarily resolve the issue of what constitutes personal background information for purposes of a "routine booking information" exception. See *Muniz*, 496 U.S. at 601-02. In *Muniz*, the four Justices who relied on the existence of a "routine booking information" exception to *Miranda* stated:

> "We disagree with the Commonwealth's contention that Officer Hosterman's first seven questions regarding Muniz's name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation as we defined the term in *Innis*, *supra*, merely because the questions were not intended to elicit information for investigatory purposes. As explained above, the *Innis* test focuses primarily upon 'the perspective of the suspect.' [Citation omitted.] We agree with *amicus* United States, however, that Muniz's answers to these first seven questions are nonetheless admissible because the questions fall within a 'routine booking question' exception which exempts from *Miranda*'s coverage questions to secure the "'biographical data necessary to complete booking or pretrial services."' [Citations omitted.] The state court found that the first seven questions were 'requested for record-keeping purposes only.' [citation omitted], and therefore the questions appear reasonably related to the police's administrative concerns. In this context, therefore, the first seven questions asked at the booking center fall outside the protections of *Miranda* and the answers thereto need not be suppressed." *Muniz*, 496 U.S. at 601-02.

Clearly, if an exception to custodial interrogation is to be extended to routine booking questions, the pertinent inquiry cannot be whether the questions elicit incriminating responses. The analysis in Part III-C of the *Muniz* opinion did not focus on whether the questions for personal information were reasonably likely to elicit an incriminating response. Rather, the portion of the Court that recognized an exception to

*Miranda* for routine booking questions examined law enforcement's need for the questions, *i.e.*, were the questions designed to provide law enforcement with information helpful to their investigation of a crime or merely helpful with the administration of processing and identifying the individual?

When the pre-*Miranda* questions in the present case are analyzed in this context, it is clear that the majority of the questions fall outside the scope of custodial interrogation within the meaning of *Miranda*. When Detective Naldoza first entered the room to begin the interrogation, Arriaga asked about going home. The detective responded that it remained to be seen whether Arriaga would go home or go to jail. Arriaga then indicated that he would rather stay in the interview room than go to jail, indicating that he had been in jail previously. Because the incriminating inference was volunteered by Arriaga and not a response to anything the detective said or did, the comment did not violate *Miranda*. See *State v. Warledo*, 286 Kan. 927, 936, 190 P.3d 937 (2008). Nevertheless, this portion of the interview was redacted from the video shown to the jury at trial and could not have prejudiced Arriaga's trial.

Detective Naldoza then began a series of questions similar to the questions approved in *Muniz* and *Garcia*. All of these questions were related to administrative responsibilities of the detective and included Arriaga's name and its correct spelling, his age and birthdate, his address, and his birthplace. Arriaga's response to the question about where he was born was also redacted from the video shown to the jury, not because it violated *Miranda* but because the potential for prejudice outweighed the probative value of the information. The fact that Arriaga was a noncitizen had no bearing whatsoever in the jury's determination whether he committed aggravated assault.

Similarly, Naldoza's questions about Arriaga's marital status properly fall within the parameters of administrative information. While the information might have been somewhat incriminating under the facts of this case, administrative needs for contact

9

information arguably fall within the parameters of the type of personal identifying information exempted from *Miranda*. In addition, the questions regarding Arriaga's marital status and the questions regarding his car are of the same nature of the questions asked the suspect in *Garcia*. These questions were not intended to elicit an incriminating response related to the crime under investigation and did not provide incriminating information in the sense that the information revealed Arriaga's thought processes rather than information related to his status. See *Garcia*, 233 Kan. at 606-07. Furthermore, there was no controversy at trial concerning the type of car Arriaga drove or the relationship between Arriaga and Samano.

Admittedly, Naldoza's conversation with Arriaga about his prior illegal drug use constituted incriminating evidence outside the realm of legitimate administrative questioning. Although the law only prohibits the *possession* of illegal drugs, not the *ingestion* of those drugs, a person cannot ingest drugs without first possessing them. But, an admission to the general use of drugs might supply relevant incriminating evidence in a prosecution for the current possession of drugs or other drug-related offenses. The questions serve no useful administrative function, unlike a question about whether a suspect is currently under the influence of any drug, which goes to the suspect's ability to understand his or her rights. Therefore, the questions exceeded the scope of legitimate personal information related to administrative functions of law enforcement.

Similarly, Naldoza's questions about Arriaga's criminal record were also improper. They serve no useful administrative purpose. This is in contrast to questions attempting to ascertain Naldoza's current probation or postrelease supervision status, which might serve a legitimate administrative function in enabling the officers to contact court services. Questions seeking general information about a suspect's criminal past serve no legitimate administrative function.

As a result, the general questions about Arriaga's drug use and prior convictions constituted impermissible custodial interrogation before Arriaga received his *Miranda* warnings and should have been suppressed. But, in this case, the impermissible questions and their responses were elicited toward the end of the pre-*Miranda* portion of the interview. The questions and Arriaga's responses were not presented to the jury. They were redacted from the version of the video recording shown to the jury. Consequently, Arriaga has not demonstrated error that adversely affected his trial.

*Post-Miranda Statements*

Arriaga also raises two claims for suppressing his post-*Miranda* statements to Naldoza. First, he contends that the post-*Miranda* statements should have been suppressed because they were tainted by the pre-*Miranda* custodial interrogation. Second, he contends that Naldoza's statement regarding the persons to whom the *Miranda* protections extended confused him and led him to believe that the protections did not extend to noncitizens.

Law enforcement officers may not subvert the protections of *Miranda* by conducting an impermissible custodial interrogation until they obtain an admission, stop the questioning to provide the suspect with a warning of his or her rights, and then continue the questioning after the suspect waives those rights. See *Missouri v. Seibert*, 542 U.S. 600, 617, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004). Incriminating statements made after *Miranda* warnings are not inevitably tainted by prior unwarned statements. See *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) ("[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the

11

conditions that precluded admission of the earlier statement."); *State v. Lewis*, 299 Kan. 828, 838-39, 326 P.3d 387 (2014) (applying *Elstad* and *Seibert*).

Whether statements made following *Miranda* warnings delivered during a custodial interrogation are admissible ultimately hinge upon the voluntary nature of the statements under the totality of the circumstances. See *State v. Hebert*, 277 Kan. 61, 76, 82 P.3d 470 (2004). To assist with this determination, the United States Supreme Court has identified a nonexclusive list of factors a court should consider in determining whether *Miranda* warnings delivered during custodial interrogation tainted any warned confessions.

> "The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615.

Under the circumstances presented in this case, the *Miranda* warnings afforded Arriaga during the interview were sufficient to purge any taint associated with any pre-*Miranda* custodial interrogation. First, as previously noted, the few questions that did not constitute permissible "routine booking questions" related to actions completely isolated from the charges discussed post-*Miranda*. The questions dealt with Arriaga's prior unlawful conduct, not the conduct under investigation. Second, Arriaga never provided an admission related to the aggravated assault charges during the initial round of questioning. Third, while Naldoza continued the interview without an identifiable break, he did signify a distinction between the first round of questions and the second by providing the *Miranda* warnings on a printed sheet, removing Arriaga's handcuffs, and focusing the discussion on the criminal allegations against Arriaga in this case. Under the

12

totality of the circumstances, a reasonable person in Arriaga's position would not have felt compelled to provide admissions regarding the aggravated assault charges based upon his admissions to prior crimes and drug use in the pre-*Miranda* portion of the interview. In all events, our determination that the information provided by Arriaga prior to receiving his *Miranda* warning did not violate his rights precludes the finding that his post-*Miranda* statements were tainted by the pre-*Miranda* questioning. The district court did not err in refusing to suppress Arriaga's post-*Miranda* admissions.

Arriaga suggests that his post-*Miranda* statements were involuntary because he was confused by Naldoza's statement that the constitutional protections extended to citizens of the United States, to which class Arriaga knew he did not belong. During the suppression hearing, Arriaga testified to his belief that the rights did not apply to him. The district court rejected Arriaga's testimony, specifically finding that Naldoza's statements about the constitutional protections extended to citizens did not create a coercive environment for Arriaga under the totality of the circumstances.

In assessing whether statements made by a suspect to a law enforcement officer were the product of a free and independent will or of police coercion, the district court examines the totality of the circumstances including, but not limited to, the suspect's mental condition; the manner and duration of the interrogation; the suspect's ability at his or her request to communicate with the outside world; the suspect's age, intellect, and background; the fairness of the officers conducting the interrogation; and the suspect's fluency in English. *State v. Randolph*, 297 Kan. 320, 326, 301 P.3d 300 (2013). Factors demonstrating coercion are not to be weighed against factors suggesting a lack of coercion. But, the circumstances may dilute the presence of a particular factor that, in another context, might render the statements involuntary. The ultimate inquiry is whether the relevant circumstances, when considered together, lead to a conclusion that the suspect's will was overborne and his or her statements were not a free and voluntary act. *Randolph*, 297 Kan. at 326.

13

In this appeal, Arriaga does not point to any factor suggesting a coercive environment during his interrogation, other than Naldoza's characterization of the persons to whom the *Miranda* protections extended. The record reveals nothing to suggest that Arriaga's mental state at the time of the interview was somehow impaired. He claimed he did not suffer from a mental or health condition or from the use of illegal or prescription drugs or alcohol. He indicated that he had slept a full 8 hours the preceding night. All of his responses to Naldoza's questions were cogent and appropriate. He asked several questions of Naldoza, demonstrating mental engagement in the conversation. The post-*Miranda* portion of the interrogation, which lasted approximately 30 minutes, was extremely relaxed. Naldoza essentially permitted Arriaga to explain his version of the event, only occasionally asking for clarification on some point. Naldoza never denied a request by Arriaga to make a phone call, take a break, or obtain food or water. Naldoza never suggested that Arriaga needed to talk to him and indicated that the decision was entirely Arriaga's. While English was clearly not Arriaga's first language, his command of English was completely fluent. He never demonstrated difficulty in choosing his own words or understanding Naldoza's.

Accordingly, the only coercive element present during Arriaga's interrogation was Naldoza's suggestion that the constitutional protections contained in the *Miranda* warnings extended only to citizens. When placed in the context in which these statements were made, they cannot objectively be deemed coercive. In presenting Arriaga the *Miranda* warnings form, Naldoza said:

> "Jose, this piece of paper has printed on it your constitutional protections. And these are protections afforded to you and afforded to every citizen of the United States by the Constitution to ensure that you're protected. It ensures that you're protected from being abused, protected from being tortured, protected from being forced into doing something or saying something you don't want to do or something you don't want to say. [It] protect[s] you from being tricked into doing something or saying something that you

14

don't want to do or say. It also protects me, too. I don't want to be—I don't want people to say that I tried to do those things to you, 'cause its against the law."

Prior to giving the *Miranda* warning, Naldoza clearly and repeatedly told Arriaga that he had rights which protected him from "doing something or saying something you don't want to do or something you don't want to say." Prior to the actual review of the *Miranda* rights form, Naldoza told Ariaga that he would read each sentence of the form to Arriaga and ask him if he understood what he had been told. If so, Arriaga was instructed to place his initials next to the sentence Naldoza had just read. The first sentence Naldoza read to Arriaga stated:  "Before we ask you any questions, you must understand your rights." Arriaga indicated that he understood. Naldoza proceeded to read the remaining rights, and Arriaga asked what it meant that anything he said could be used against him in court. After Naldoza explained that if Arriaga told him something during the interview it could be used against Arriaga in a legal proceeding, Arriaga indicated that he understood. When he finished reading the rights, Naldoza asked whether Arriaga had any questions about any of the rights that had just been reviewed. Naldoza then read the portion of the form that asked:  "Having these rights in mind, do you wish to talk to me now, no or yes?" Arriaga indicated a bit of reluctance, stating, "I don't know about that." Naldoza responded, "It's up to you, my friend." Naldoza then waited quietly until Arriaga agreed to speak with him.

Under these circumstances, a reasonable person in Arriaga's position would have understood that the rights applied to him, despite his lack of citizenship. Naldoza painstakingly reviewed the rights, answered Arriaga's questions about them, and confirmed that Arriaga understood the rights. After reading the rights and Arriaga indicated doubt about whether to talk with Naldoza, Naldoza did not pressure him or tell him that the rights were not applicable to him but told him that the decision was Arriaga's. Ultimately, if Arriaga had no rights, why would Naldoza go over those rights so thoroughly with Arriaga? Under the totality of the circumstances, the slight

15

implication that the constitutional rights applied only to United States citizens was not sufficient to undermine the deliberate extension of those rights to Arriaga. This argument does not warrant suppression of Arriaga's statements to Naldoza.

Finally, even if Arriaga's statements were admitted in violation of *Miranda*, the erroneous admission would have been harmless beyond a reasonable doubt. See *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991) (applying constitutional harmless error test to erroneous admission of involuntary statement to police); *State v. Aguirre*, 301 Kan. 950, 962, 349 P.3d 1245 (2015) ("[*State v.*] *Swanigan* [, 279 Kan. 18, 45, 106 P.3d 39 (2005),] clarified that the harmless error rule applies to the erroneous admission of an involuntary confession."); see also *State v. Moyer*, 302 Kan. 892, 917, 360 P.3d 384 (2015) (reiterating the constitutional harmless standard as proof beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record).

While Arriaga's admissions established his participation in the driving incident, this fact was not disputed. Although he admitted that someone might have been harmed, Arriaga denied that he intended to cause harm and insisted that he did not believe anyone would be harmed. These statements might have been damaging in a case charging reckless aggravated battery, but the admission does not substantially further the jury's duty to determine the elements of aggravated assault. See K.S.A. 2015 Supp. 21-5412(a) and (b)(1) (collectively defining aggravated assault as "knowingly placing another person in reasonable apprehension of immediate bodily harm . . . [w]ith a deadly weapon"). Arriaga's admissions did not remove the State's obligation to prove the intent to place the occupants of the truck in apprehension of immediate bodily harm. Evidence of this intent was inferred almost exclusively through the narrative accounts of Samano and Perez and their descriptions of their perceptions of the event. Any erroneous admission of Arriaga's statements was harmless beyond a reasonable doubt.

16

DID THE DISTRICT COURT ERR IN REFUSING TO GIVE A MULTIPLE-ACTS UNANIMITY INSTRUCTION AS REQUESTED BY ARRIAGA?

Next, Arriaga contends the district court erred in refusing to give the requested multiple-acts jury instruction. Appellate courts now employ a multifaceted review of an appellate challenge to jury instructions. First, a reviewing court establishes the extent of the review based upon the court's jurisdiction and the appellant's preservation of the issue in the district court. This determination, being a question of law, is subject to unlimited appellate review. Next, the court determines the appropriateness of the challenged instruction, legally and factually. The court's review of the legal appropriateness of the instruction is also subject to unlimited review; its review of the factual appropriateness is based upon the sufficiency of the evidence supporting the instruction, when viewed in a light most favorable to the party requesting the instruction. Finally, if an instruction was either given or omitted in error, the appellate court considers whether the error could have been harmless. *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

*Preservation*

There is no question in this case that the jury instruction issue Arriaga raises on appeal was properly preserved in the district court. K.S.A. 2015 Supp. 22-3414(3) requires a party in a criminal proceeding to register an objection to a proposed instruction or an omitted instruction before the jury retires to begin deliberations. The objection must distinctly state the matter to which the party objects and the grounds for the objection. See *Woods*, 301 Kan. at 876 (citing K.S.A. 2011 Supp. 22-3414[3] for duty to state distinctly an objection before jury retires). Here, Arriaga requested a unanimity instruction during the jury instruction conference based upon his belief that the State's evidence demonstrated multiple acts that might have supported the single charge of aggravated assault. The district court specifically rejected the instruction, characterizing the factual occurrences of the case as a unitary criminal act.

17

*Appropriateness*

Where the State presents evidence of two or more acts, each of which could support a conviction for the charged crime, the State must either elect the act it wishes the jury to consider or the court must instruct the jury that its verdict must be unanimous as to the act constituting the charged crime. *State v. Sprague*, 303 Kan. 418, 423, 362 P.3d 828 (2015) (citing *State v. Santos-Vega*, 299 Kan. 11, 18, 321 P.3d 1 [2014]).

Whether the State has presented multiple acts that independently satisfy the elements of the charged offense depends, in turn, on whether the evidence reveals incidents that are legally and factually separate. *Sprague*, 303 Kan. at 423 (citing *State v. De La Torre*, 300 Kan. 591, 598, 331 P.3d 815, *cert. denied* 135 S. Ct. 728 [2014]; *State v. King*, 297 Kan. 955, 979-80, 305 P.3d 641 [2013]). The Kansas Supreme Court has adopted four factors to assist with the unitary-act/multiple-acts determination: (1) Did the incidents occur within the same temporal proximity (*i.e.*, within the same timeframe)? (2) Did the incidents occur within the same location? (3) Is there a causal relationship between the incidents (focusing particularly on the existence or absence of intervening events)? and (4) Was there some fresh impulse motivating the defendant's conduct? *King*, 297 Kan. at 981 (quoting *State v. Schoonover*, 281 Kan. 453, 507, 133 P.3d 48 [2006]).

When the circumstances of this case are closely examined, the district court's characterization of the incidents as unitary conduct is justified. Though the various collisions between the two vehicles occurred blocks apart, which might seem to indicate separate events, the incidents may fairly be viewed as occurring within the same general location, given the nature of a car chase. Arriaga's pursuit of the truck was never interrupted, in spite of Ezekial's attempt to elude Arriaga for a period of time. The stress of the occupants of the truck was therefore never alleviated to begin anew when Arriaga relocated them. The evidence presented at trial did not indicate that Arriaga's motive for chasing the truck—jealousy in witnessing his ex-girlfriend/ex-wife with another man—

18

ever changed during the pursuit. The various incidents involved in the car chase constituted unitary criminal conduct.

Caselaw based upon similar factual circumstances support this conclusion. In *State v. Castleberry*, 301 Kan. 170, 186-87, 339 P.3d 795 (2014), a fugitive attempted to evade police in his car and, after being stopped with stop sticks, resisted the officers' commands when they were attempting to place him under arrest. Castleberry argued that the conduct occurring in his car was separate and distinct from the conduct displayed after he emerged from his car, thus justifying a unanimity instruction for multiple acts. The Kansas Supreme Court disagreed. 301 Kan. at 187 ("Because Castleberry's actions were all part of one continuous act, unbroken by a fresh impulse, this was not a multiple acts case.").

In *State v. Bischoff*, 281 Kan. 195, 201-03, 131 P.3d 531 (2006), the Kansas Supreme Court reversed a conclusion by this court that a car chase for 30 minutes followed by a decision to deviate from a planned route so that he could stop and confront the driver of the other vehicle constituted multiple acts.

"[*State v.*] *Kesselring*[, 279 Kan. 671, 112 P.3d 175 (2005)] is analogous to the instant case. Like the crime of kidnapping, the crime of aggravated assault, in the form of 'road rage,' may occur over a longer period of time. Although the events at issue transpired for perhaps 8 minutes over approximately 8 miles, once Bischoff 'initiated the altercation' [citation omitted], there were no breaks in the sequence of events sufficient to establish separate criminal acts. The incidents on the interstate and on the exit ramp prior to Bischoff leaving his semi were a continuous incident, as road rage. Bischoff's exit ramp conduct in his semi was not motivated by a fresh impulse." *Bischoff*, 281 Kan. at 203.

In *State v. Crossett*, 50 Kan. App. 2d 788, 322 P.3d 840 (2014), *rev. denied* 302 Kan. ___ (August 20, 2015), the defendant challenged the district court's failure to give a

unanimity instruction for multiple acts. The evidence demonstrated that Crossett chased a vehicle containing three adults and two children, driving erratically. When the other vehicle pulled over, Crossett got out of his truck and banged on the window, demanding access to one of the adult passengers. When the driver of the other vehicle pulled away, Crossett returned to his vehicle and continued to pursue. Crossett tried to force the other vehicle off the road. When the other vehicle again stopped, Crossett angled his vehicle so that the other vehicle could not drive away, again approaching the window. After reviewing *Bischoff*, *Kesselring*, *State v. Hilson*, 28 Kan. App. 2d 740, 20 P.3d 94, *rev. denied* 271 Kan. 1039 (2001), and *State v. Staggs*, 27 Kan. App. 2d 865, 9 P.3d 601, *rev. denied* 270 Kan. 903 (2000), this court rejected Crossett's multiple-acts argument.

> "After considering Crossett's actions within the context of the four factors set out in *Schoonover*, and the factual scenarios of *Bischoff*, *Kesselring*, *Staggs*, and *Hilson*, Crossett's actions were not multiple acts but constituted one single continuous course of conduct. Crossett's testimony failed to establish any meaningful break in the action that would establish separate acts. Although the events transpired over several miles, there were no breaks in the sequence of events sufficient to establish separate criminal acts. Similar to *Bischoff*, if the State had charged Crossett with separate counts of aggravated child endangerment based on events before and after the final stop, defense counsel would undoubtedly be raising a claim of multiplicity. The incident here was not susceptible to dissection into further components that would constitute multiple acts; rather, it was a continuous incident that could not be factually separated. As a result, it was not clearly erroneous for the trial court to not give a unanimity instruction because Crossett's case did not involve multiple acts." *Crossett*, 50 Kan. App. 2d at 797-98.

*Crossett* is instructional on one further point. There were two children in the vehicle that Crossett pursued and he was charged with two separate counts of child endangerment. The multiple-acts argument did not involve a single charge pertaining to multiple victims. Here, the evidence demonstrated three potential victims of Arriaga's road rage. Nevertheless, this evidence also does not raise a multiple-acts problem because the State clearly elected the victim of the charged crime, *i.e.*, Ineida Samano. See

20

*Sprague*, 303 Kan. at 423 (no unanimity problem where State elects act supporting the charge). Because Arriaga's conduct in chasing and bumping Ezekial's truck on the streets of Wichita constituted a continuous course of conduct and the State elected the victim of the charged aggravated assault, the evidence did not support a finding of multiple acts, warranting a jury instruction on unanimity. Accordingly, the district court did not err.

*Harmlessness*

Because the district court did not err in refusing to give the requested unanimity instruction, this court need not consider whether the omission of the instruction was harmless.

### DID THE IMPOSITION OF THE AGGRAVATED PENALTY WITHIN THE APPLICABLE SENTENCING GRID VIOLATE ARRIAGA'S RIGHT TO DUE PROCESS?

Arriaga's last issue on this appeal concerns the district court's imposition of the aggravated penalty within the applicable sentencing grid. He contends the sentence constituted an enhancement of the applicable penalty without a jury finding beyond a reasonable doubt, which violates his right to due process as interpreted by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007).

As Arriaga notes, this issue was not raised before the trial court, but Kansas appellate courts have addressed *Apprendi* claims for the first time on appeal. See *State v. Gould*, 271 Kan. 394, 404-05, 23 P.3d 801 (2001) (applying the holding of *Apprendi* to declare unconstitutional Kansas' upward sentencing departure procedure based on an issue raised for the first time on appeal).

21

Nevertheless, the sentencing issue raised by Arriaga is controlled by prior Kansas Supreme Court precedent. See *State v. Johnson*, 286 Kan. 824, 851, 190 P.3d 207 (2008). This court is bound to apply precedent of our Supreme Court absent some indication the court is departing from that precedent. *State v. Ottinger*, 46 Kan. App. 2d 647, 655, 264 P.3d 1027 (2011), *rev. denied* 294 Kan. 946 (2012). The Kansas Supreme Court has given this court no indication that it intends to depart from its conclusion in *Johnson*. See *State v. Smith-Parker*, 301 Kan. 132, 135, 340 P.3d 485 (2014) (citing *Johnson* with approval). Arriaga's sentence was within the grid box and, therefore, this court has no jurisdiction to consider this issue and this issue must be dismissed.

Affirmed in part and dismissed in part.