NOT DESIGNATED FOR PUBLICATION

Nos. 118,270
118,271

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANNY L. ALEXANDER,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed May 17, 2019. Affirmed.


*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.


*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before HILL, P.J., BUSER, J., and SIDNEY R. THOMAS, District Judge, assigned.


BUSER, J.:  Danny L. Alexander appeals his convictions for aggravated indecent liberties with two children under 14 years of age. Alexander raises five issues on appeal: (1) The district court erred in admitting Alexander's involuntary statements to police; (2) K.S.A. 2018 Supp. 60-455(d) is unconstitutional; (3) the district court erred in admitting K.S.A. 2018 Supp. 60-455(d) evidence because it was more prejudicial than probative; (4) the district court erred in failing to provide a limiting instruction regarding K.S.A. 2018 Supp. 60-455(d) evidence, and (5) the district court erred in giving an erroneous jury instruction defining lewd touching.

1

Upon our review, we find no error and, therefore, affirm the convictions.

FACTUAL AND PROCEDURAL BACKGROUND

Alexander was initially charged in a complaint with two counts of aggravated indecent liberties with a child under 14 years of age for the lewd touching of W.B. in 2016. At the time, W.B. was 9 years of age. Count 1 alleged lewd fondling that occurred in a motor vehicle, and count 2 alleged lewd fondling that occurred at W.B.'s home. A separate complaint alleged that Alexander committed one count of aggravated indecent liberties with a young boy, R.M., in 2008. Upon the State's motion, the district court consolidated the complaints for trial. The following facts were presented during the criminal proceedings.

Alexander was a friend of W.B.'s family. W.B.'s mother and father routinely provided Alexander with rides to an establishment named the Lord's Diner. On these occasions, Alexander and W.B. rode in the back seat of the truck. One day in October 2016, as the family was about to leave for the Lord's Diner, W.B. said he did not want to go if Alexander was also going because "Danny touched me in my privates." A subsequent police interview of W.B. revealed that Alexander had touched his "wee-wee" on more than one occasion; once in the truck while traveling to the Lord's Diner and once at W.B.'s home while they were watching a movie.

Detective Jason Waite called Alexander to schedule an interview about the allegations. Alexander agreed to meet with the detective, and during the interview Alexander made admissions against interest regarding the lewd touching of W.B., R.M., and other young children. In particular, Alexander repeatedly denied ever intentionally touching W.B. in the car or while watching a movie. He also stated that since a prior conviction for inappropriately touching a child, he did not want to be alone with any children. Ultimately, Alexander admitted that he might have accidentally touched W.B.'s

2

penis one time in the car, but not that he could remember. Alexander was arrested at the conclusion of the interview.

Prior to trial, Alexander filed a motion for a so-called *Jackson v. Denno* hearing to challenge the voluntariness of the incriminating statements he made during his interview with Detective Waite. See *Jackson v. Denno*, 378 U.S. 368, 385, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). After an evidentiary hearing, the district court found the statements were voluntarily made and admissible as evidence at trial.

The State also filed a pretrial motion to admit evidence of prior acts of sexual misconduct at trial under K.S.A. 2016 Supp. 60-455(d). After a hearing, the district court granted the motion and ruled the evidence of Alexander's prior lewd touchings was admissible under K.S.A. 2016 Supp. 60-455(d).

At trial, W.B., who was 10 years old at the time, testified regarding two occasions when he was lewdly touched by Alexander. At the time of the offense, W.B. was about nine years old. The two incidents occurred in 2016. One occurred when W.B. was riding in the back seat of his family's truck with Alexander. On this occasion, Alexander touched W.B.'s "private" on top of his clothes. On another occasion, Alexander touched W.B.'s private while the two individuals were watching a movie in the front room of W.B.'s family residence. W.B. testified that Alexander "would just, like, touch it and then get off." According to W.B., when Alexander touched him on his privates, "That made me sad." W.B. stated that the touching "made my private, like, kind of purple. . . . [I]t hurted a little."

R.M., who was 13 years old at the time of trial, also testified as a State's witness. R.M. testified that when he was four or five years old, Alexander asked his mother if he could take R.M. to a Walmart in Wichita to get candy. According to R.M., during the trip Alexander touched his private area over his clothes in the Walmart parking lot. Shortly

3

thereafter, Alexander took R.M. to Alexander's house. R.M. testified that Alexander first touched his private area over his clothes and then placed his hand underneath his clothes and directly touched his private area for five minutes.

At the conclusion of the evidence, the jury found Alexander not guilty of aggravated indecent liberties with W.B. in the truck but found him guilty of the charge which occurred at W.B.'s home. Alexander was also found guilty of aggravated indecent liberties with R.M. The district court sentenced Alexander to two consecutive sentences of life imprisonment with parole eligibility after 40 years. Alexander filed a timely notice of appeal.

## DENIAL OF MOTION TO SUPPRESS ALEXANDER'S STATEMENTS

On appeal, Alexander contends the district court erred in failing to suppress his interview statements to Detective Waite because they were involuntary and violated his Fifth and Fourteenth Amendment rights under the United States Constitution. Alexander does not claim that Detective Waite failed to inform him of his *Miranda* rights but he argues that his statements were involuntary, primarily due to his low intellect, his use of drugs prior to the interview, and the detective's coercive interrogation tactics. The State counters that Alexander was not in custody during the interview and that his statements were freely, knowingly, and voluntarily made.

Prior to trial, on May 19, 2017, the district court held an evidentiary hearing to consider Alexander's motion to suppress the incriminating statements he made during Detective Waite's videotaped interview. The detective testified on behalf of the State. Alexander testified on his own behalf. The district court also viewed the videotaped interview. At the suppression hearing, the following testimony was developed.

4

Detective Waite called Alexander to schedule an interview regarding the allegations. During the phone conversation, Alexander asked Detective Waite if he was going to be arrested. Detective Waite responded that he was not planning on it, but depending on what was said in the interview, it was a possibility. After rescheduling due to a conflict, Alexander arrived for the interview at the police station on his own, but he later testified that he was afraid of going to jail.

At the beginning of the interview, Alexander told Detective Waite that he had a second-grade education and could not read very fast. Detective Waite replied that he understood. Alexander also stated that he has been on disability since 2006, but he was able to perform odd jobs. His disability status is due to his limited education and physical disabilities.

Before Detective Waite asked Alexander any questions, he provided him with a standard *Miranda* rights waiver form. Alexander replied, "I know my rights." Detective Waite advised Alexander that he was required to review the rights with him even though he was not under arrest. Alexander was also informed that he could walk out the door at any time. In response, Alexander stated that if he walked out the door, it would show that he was guilty. Alexander later testified that he did not feel free to leave because he was afraid of Detective Waite.

When Detective Waite presented the *Miranda* rights waiver form to Alexander, he asked him to read it back to him. As Alexander read the form, he made a checkmark by each line indicating that he understood the statement. Alexander then stated his willingness to speak with Detective Waite. At the hearing, Alexander testified that he did not understand some portions of the form and felt that he did not have time to ask Detective Waite to explain things to him. On the other hand, the detective testified that Alexander "read the form fine."

Detective Waite asked Alexander if he was under the influence of any substances. Alexander told the detective that he had smoked a joint the night before, but he later testified that he also "took some crack cocaine" the day of the interview. Alexander testified that he was not clear-headed during the interview because he was still under the influence of the drugs.

Alexander told Detective Waite that he did not know why W.B.'s family made their sexual assault accusations. He repeatedly denied lewdly touching W.B. in the truck or while watching a movie and if W.B. ever bumped into him, Alexander said he would push him away. Alexander also indicated that, ever since his prior conviction, he did not want to be alone with any children. Later, Alexander admitted that he might have accidentally touched W.B.'s penis one time in the car, but not that he could remember.

During the interview, Detective Waite asked several questions about Alexander's history of inappropriately touching children. Alexander explained that he was convicted in 1993 for touching a child inappropriately, received two years of probation and was ordered to complete mental health counseling. It was later determined that this conviction actually occurred in 1991. Alexander acknowledged that he had made a mistake on that occasion.

Detective Waite stated that W.B.'s accusations were similar to Alexander's past behavior and he suggested that Alexander was making some bad choices. Alexander agreed. When the detective asked if Alexander had been seeking any help for his bad choices, Alexander responded that he wanted help but did not know how to get it. Detective Waite then stated, "Danny, if you're making bad choices and you're wanting help and that's what I'm hearing you tell me, that you're making some bad choices, you want some help." Alexander replied, "Yeah." In response, Detective Waite said, "Okay, well I can't, I can't help you at all if you and I can't sit here and have an honest

6

conversation." Alexander said he was trying to be as honest as possible but he maintained that he did not touch W.B.

During the interview, Alexander was asked why he was living by a school when he knew he had a problem with children. Detective Waite continued, "Danny, what I hear, what I hear you saying is that you know you've got a problem with kids." Alexander admitted that he had a problem and again stated that he wanted help. Alexander advised that his problem began in 1968 when he touched his cousin inappropriately. He also admitted to "jacking . . . off" his five year-old cousin in the 1970s and his five year-old neighbor in the 1980s. Alexander also volunteered that he had inappropriately touched R.M. in 2008. Alexander later testified that he volunteered this information because he likes to be honest with people.

Alexander repeated that he had a problem and he wanted help. Detective Waite replied, "Well, I can't get you help if you're not going to be honest with yourself and with me." Alexander replied that he was being honest. Detective Waite told him he needed to know what happened with W.B. "so we can, we can start this process right now." Later, Alexander stated that Detective Waite was mixing him up and he did not know the truth anymore. Detective Waite continued to press Alexander until he admitted that he might have touched W.B., but it could have been during a blackout. At the end of the interview, Detective Waite arrested Alexander.

After considering the evidence, the district court took the matter under advisement until May 22, 2017, when it orally announced its findings of fact and conclusions of law from the bench. The district judge ruled: "The defendant's statements were freely, voluntarily, and intelligently made and the product of his rational intellect and free will and made with a clear understanding of his constitutional rights. My finding is in compliance with K.S.A. 22-3215, which codifies *Jackson v. Denno*." The district court's factual findings are noteworthy for their detail and thoroughness. In particular, the district

7

court considered the six factors of voluntariness which are set forth in *State v. Gibson*, 299 Kan. 207, 214-16, 322 P.3d 389 (2014). The district court's findings comprised 14 transcript pages.

At the outset, although the district court did not make a finding regarding whether Alexander's interrogation was custodial in nature, it did conclude that "the law regarding *Miranda* was complied with." On appeal, Alexander does not claim a violation of his *Miranda* rights and, as a result, we will not review that aspect of the district court's legal conclusion.

The crux of Alexander's complaint is that his answers made during the interrogation were not voluntary. Our standard of review provides a bifurcated standard when reviewing whether a defendant's inculpatory statements were voluntary. *Gibson*, 299 Kan. at 215-16. The appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The appellate court then reviews the legal conclusions based on those factual findings under a de novo standard. 299 Kan. at 215-16. "An appellate court does not reweigh evidence, assess witness credibility, or resolve conflicting evidence." 299 Kan. at 216.

On appeal, Alexander does not challenge the district court's extensive factual findings. Moreover, our review shows that the material findings are supported by substantial competent evidence. We will proceed to the second aspect of the voluntariness test and analyze Alexander's assertion that the district court erred in its legal conclusion that the interview was voluntary.

When challenged, the State must prove that the defendant's statements were voluntary by a preponderance of the evidence. In determining whether the statements were freely given, courts consider a nonexclusive list of factors:  "(1) the accused's mental condition; (2) the manner and duration of the interview; (3) the accused's ability

8

to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) the accused's fluency with the English language." 299 Kan. at 214. These factors are viewed under the totality of the circumstances. 299 Kan. at 214. As noted earlier, the district court specifically considered these six factors in its analysis. Alexander and the State also follow this analytical approach in their appellate briefing. We will do the same.

*Accused's mental condition.*

Alexander argues this factor weighs against voluntariness because his mental condition could not withstand an aggressive police interrogation. Alexander asserts he was unclear about some aspects of the *Miranda* rights waiver form and, during the interview, he simply agreed with Detective Waite's statements and at other points he became confused. Alexander also points out that he has a speech impediment and was on disability.

The district court found that Alexander appeared to be mentally alert and not lethargic or lacking in sleep. The district court noted that Alexander lives on his own, was not currently suffering any mental health issues, and his demeanor was the same at trial as it was during the interview. Of note, the district court found that Alexander was not under the influence of intoxicants at the time of the interview.

We are persuaded that this factor weighs in favor of voluntariness. Alexander was 61 years old. With little formal education, he still was able to have a meaningful conversation with Detective Waite throughout a long interview. Just before Alexander read the *Miranda* waiver form, he told Detective Waite, "I know my rights." Alexander told Detective Waite that he read slowly, but the detective informed him that he could ask any questions about his rights. Alexander stated that he understood his rights after he finished reading the waiver form.

9

Even though Alexander testified that he took crack cocaine earlier that morning, he was able to accurately recall personal information and recited phone numbers, addresses, and dates from memory. While Alexander later testified that he was not clear-headed during the interview, on the recording he appeared alert and coherent. Alexander responded appropriately to the detective's questions. His prompt responses indicated a knowing understanding of the questions and the ability to formulate appropriate answers.

*Manner and duration of the interview.*

While Alexander mentions this factor, he does not take a position with regard to how this factor affects the voluntariness inquiry. Alexander notes the actual interrogation lasted about two hours and confirms that he was allowed three restroom breaks as requested. Alexander also acknowledges that "he was not physically punished at any point."

This factor weighs in favor of a voluntary interview. The interview was not overly long and included several breaks. Alexander was also provided with a bottle of water. The interview was in a standard interview room with one table and two chairs. Detective Waite was the only police officer in the interview room. Alexander was not restrained until the end of the interview when he was placed under arrest. Our review of the recorded interview shows that Detective Waite and Alexander were calm and respectful during the interview, similar to having a conversation. The detective did not threaten or yell at Alexander at any point.

*Accused's ability to communicate with the outside world.*

Both parties agree that Alexander never requested communication with the outside world before or during the interview. Alexander contends that he asked to arrange for someone to care for his pets towards the end of the interview, but Detective Waite would

not allow it. The State counters that at the conclusion of the interview, Detective Waite told Alexander he could contact someone to take care of his pets.

The district court concluded, "This factor at best supports voluntariness. At worst, it is neutral." In making this conclusion, the district court observed that Alexander never asked to speak to anyone, never asked to stop the interview, or sought legal counsel.

The record shows that the interview took place in an enclosed, unlocked room. During the interview, Alexander did not make any requests to speak with anyone. Alexander asked for a few cigarette breaks, but this request was declined. Only at the conclusion of the interview did Alexander express concern about his pets, and this request was addressed by Detective Waite a short time later. Evidence supporting this factor favors a voluntary interview.

*Accused's age, intellect, and background.*

Alexander contends that he is 61 years old with a second-grade education and is on disability. Alexander says he was a slow reader, needed assistance with the meaning of certain words, and was confused at times. In short, Alexander argues that he did not have the intellect to knowingly and voluntarily respond to Detective Waite's questions.

The district court found that Alexander could read and understand English. The district court also observed that Alexander

> "has a full lifetime of education from the school of experience. That said, the lack of formal schooling did not adversely affect the voluntariness of his statements. . . . [T]he defendant is able to more than sufficiently articulate his beliefs, recollections, and feelings. He was appropriately assertive and descriptive during the interview."

11

In this regard, the district court noted that Alexander had a prior experience with the criminal justice system. The district court concluded, "There is no evidence that the defendant was disadvantaged by his age, intellect, education or background, and so this factor supports voluntariness."

We agree with the district court's legal conclusion. Alexander was 61 years old, disabled, yet living on his own, paying his own bills, and working odd jobs. He exhibited a good memory of his personal history, street addresses, phone numbers, and significant dates. Despite a speech impediment, Alexander was able to converse with Detective Waite and gave appropriate answers to the detective's questions. He was not taking any medications for mental health issues. Finally, given his prior conviction for aggravated sexual battery, he had some experience with law enforcement and the legal system.

*Officer's fairness in conducting the interview.*

Alexander contends that he only admitted to accidentally touching W.B. after Detective Waite implicitly promised to help Alexander with his problem. In particular, Alexander argues "the officer implicitly promised that Mr. Alexander might get some of the help he was pleading for if he simply confessed." On the other hand, the State asserts that Detective Waite's statement, "I can't help you if you're not going to be honest with yourself and with me" was not an implicit promise because Detective Waite was simply responding to Alexander's initial statement that he needed help. Instead, Detective Waite only offered that help would not be possible without Alexander's honesty.

The district court found, "There were no coercive statements, tricks or deceptive tactics which rendered [Alexander's] statements involuntary. There were no promises or threats. . . . Detective Waite was courteous. He doesn't raise his voice. He is not overly demonstrative." With regard to what Alexander characterizes as the detective's implicit

12

promise to help him with his problem if Alexander is honest with him, the district court ruled:

> "Finally, the 'well-worn rule,' as described in *State v. Stone*, [291 Kan. 13, 237 P.3d 1229 (2010)] is that, 'A mere exhortation or adjuration to speak the truth, or the mere suggestion to an accused that he confess, will not exclude a confession.' That's from *State v. Newfield*, 229 Kan. 347, [623 P.2d 347 (1981)], a 1981 case that was cited in *State v. Stone*. In conclusion, under this factor . . . [Alexander's] will was not overborne. This factor supports voluntariness."

We find no error in the district court's legal conclusion. Detective Waite called Alexander requesting an interview, informed him of the nature of the allegations, and then rescheduled the interview for two weeks later. Alexander voluntarily came to the interview, was advised he was free to leave at any time, and informed of his *Miranda* rights. As noted earlier, the interview was businesslike and without resort to threats, intimidation, or deception. At the suppression hearing, Alexander testified that he volunteered certain information because he likes being honest.

Alexander's central contention is that Detective Waite improperly promised to help him provided Alexander confessed to the crimes. A confession is deemed involuntary if it has been extorted by fear or induced by hope of profit, benefit, or amelioration. *State v. Garcia*, 297 Kan. 182, 196, 301 P.3d 658 (2013). The promise "must be such that it would likely cause the accused to make a false statement to obtain the benefit of the promise." 297 Kan. at 196.

While Detective Waite told Alexander that getting help begins with Alexander's honesty, this was in response to Alexander's initial statement that he needed help. We view the detective's advice to Alexander as insufficient to constitute an impermissible promise of a benefit that would result in his making a false statement. As our Supreme Court has held:

13

"In order for a promise of some benefit to the accused, including leniency, to render a confession involuntary, the promise must concern action to be taken by a public official. The promise must be such as would likely cause the accused to make a false statement to obtain the benefit of the promise, and the promise must be made by a person whom the accused could reasonably believe to have the power or authority to execute it." *State v. Harris*, 284 Kan. 560, Syl. ¶ 11, 162 P.3d 28 (2007).

Detective Waite's statements that Alexander needed to be honest about the incidents being investigated in order to begin the process of getting help are dissimilar to the impermissible promises our Supreme Court wrote about in *Harris*. The detective did not promise leniency or any official action in return for his confession. Moreover, under the totality of these circumstances, we are not persuaded that Detective Waite's remarks would likely cause Alexander to make a false confession. We find no error in the district court's conclusion that this factor favors a finding of voluntariness.

*Accused's fluency with the English language.*

Alexander contends that reading the *Miranda* form back to the detective does not equate to understanding what the form meant. He notes that he had difficulty reading the form and Detective Waite had to explain some words to him. The State counters that the video clearly shows that Alexander did not have difficulty reading and understanding the form. The district court easily dispensed with this factor, stating, "Finally, proficiency with the English language is not an issue. That factor supports voluntariness."

Upon our review of the recorded interview, Alexander is able to speak and read English and he was obviously able to converse with Detective Waite. Detective Waite clarified one word for Alexander but the duration of the interview revealed that Alexander was proficient in the English language. Thus, this factor weighs in favor of voluntariness.

Under the totality of the circumstances and applying the six-factor test to determine the voluntariness of Alexander's inculpatory statements, we conclude there was a preponderance of evidence that Alexander's statements to Detective Waite were freely, voluntarily, and knowingly given. Accordingly, the district court did not err in its legal conclusion that Alexander's statements were admissible at trial.

CONSTITUTIONALITY OF K.S.A. 2018 SUPP. 60-455(d)

For the first time on appeal, Alexander contends that K.S.A. 2018 Supp. 60-455(d) is unconstitutional under the Kansas Constitution because it allows prior convictions and acts of sexual misconduct to be used as propensity evidence in violation of his constitutional rights to due process and to know the nature of crimes charged.

In the district court, Alexander did not raise a constitutional issue but complained that the prior bad acts were inadmissible because they were too remote in time and more prejudicial than probative. Generally, constitutional issues raised for the first time on appeal will not be addressed but there are exceptions to this rule. *State v. Williams*, 298 Kan. 1075, 1084, 319 P.3d 528 (2014). Given Alexander's assertion of a denial of his fundamental rights, we will consider this issue.

We begin with a brief summary of our standards of review. Whether K.S.A. 2018 Supp. 60-455(d) is unconstitutional is a question of law. Questions of law merit unlimited review. See *Miller v. Johnson*, 295 Kan. 636, 646-47, 289 P.3d 1098 (2012). "When a statute's constitutionality is attacked, the statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe that statute as constitutionally valid, this court has the authority and duty to do so." 295 Kan. at 646-47.

15

K.S.A. 2018 Supp. 60-455(d) provides that in the prosecution of a sex offense, the State may use "evidence of the defendant's commission of another act or offense of sexual misconduct" and that evidence "may be considered for its bearing on any matter to which it is relevant and probative."

Alexander argues:

> "K.S.A. 60-455(d) unconstitutionally denies defendants the right to due process and to know the nature of crimes charged under the Kansas Constitution by permitting courts to admit evidence of a criminal defendant's prior convictions solely for the purpose of demonstrating the defendant has a propensity to commit the crime charged."

The State urges us to follow other panels of our court that have considered and decided this same issue and have upheld the statute.

As the State notes, other panels of our court have considered whether K.S.A. 2018 Supp. 60-455(d) violates section 18 of the Kansas Constitution Bill of Rights, which provides that "[a]ll persons . . . shall have remedy by due course of law," and section 10 of the Kansas Constitution Bill of Rights, which provides that a defendant "shall be allowed . . . to demand the nature and cause of the accusation against him." See *State v. Boysaw*, 52 Kan. App. 2d 635, Syl. ¶ 5, 372 P.3d 1261 (2016), *aff'd* 309 Kan. ___, No. 112,834, 2019 WL 1746858, at *7-8 (Kan. 2019); *State v. Speer*, No. 115,632, 2018 WL 4039457, at *3-6 (Kan. App. 2018) (unpublished opinion), *rev. denied* April 29, 2019; *State v. Toothman*, No. 115,716, 2017 WL 5016206 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* December 4, 2017; *State v. Razzaq*, No. 114,325, 2016 WL 6139148, at *2-3 (Kan. App. 2016) (unpublished opinion) *aff'd* 309 Kan. ___, 2019 WL 1746856, at *4 (Kan. 2019).

In each of these opinions, our court and the Supreme Court have considered similar arguments made by defendants challenging the constitutionality of K.S.A. 2018 Supp. 60-455(d) with reference to sections 18 and 10 of the Kansas Constitution Bill of Rights and upheld the constitutionality of the statute. In particular, we note that subsequent to the briefing in this case, the Kansas Supreme Court affirmed our court's holdings in *Boysaw* and *Razzaq* where we upheld the constitutionality of K.S.A. 2018 Supp. 60-455(d) under the Kansas Constitution Bill of Rights.

Given this precedent and persuasive authority, we decline Alexander's invitation to rule that K.S.A. 2018 Supp. 60-455(d) violates our state's constitutional guarantees to due process and to know the nature of the crime charged against the defendant. Based on the issues presented and arguments made by Alexander, we find no violation of the Kansas Constitution Bill of Rights.

ADMISSIBILITY OF K.S.A. 2018 SUPP. 60-455(d) EVIDENCE

Alexander argues that evidence of his 1991 conviction for inappropriately touching a child and his admissions to four other uncharged instances of touching children should not have been admitted at trial because the evidence was more prejudicial than probative. The State counters that the district court did not abuse its discretion in admitting the evidence.

During Detective Waite's interview of Alexander, he asked him if he had ever been arrested. Alexander responded that he was convicted in 1993 for touching a child inappropriately, received two years' probation, and was ordered to complete mental health counseling. It was later determined that the conviction was in 1991. Alexander advised that his problem began in 1968 when he touched his cousin inappropriately. He also admitted to "jacking . . . off" his five year-old cousin in the 1970s and his five year-

17

old neighbor in the 1980s. Alexander also volunteered that he had inappropriately touched R.M. in 2008.

Prior to trial the district court conducted a hearing into the State's motion to admit evidence of the prior crimes and acts of sexual misconduct under 60-455(d). In a lengthy and detailed oral ruling, the district court granted the motion and ruled that evidence of Alexander's five prior lewd touchings was admissible under 60-455(d). In particular, the district court reasoned:

> "Therefore, this Court finds that the State's proposed evidence is relevant. It is material in that it supports a disputed fact that is an issue in the current case, that fact being the defendant's propensity to commit acts of sexual misconduct and commit crimes similar to the crimes presently charged. The defendant has pled not guilty and is vigorously defending the crimes charged as well as the prior acts of sexual misconduct.
>
> "Now moving to probative value. Next, this Court finds the evidence the State seeks to admit is probative in that the prior acts of sexual misconduct have a logical tendency to prove a material fact, the defendant's propensity to commit acts of sexual misconduct. The principal probative value is the sexual misconduct committed against five children, one girl and four boys. The similarity in the nature of the prior acts of sexual misconduct and the class of victims, that being young children, apply to each other as well as to the currently charged cases."

The district court also conducted a weighing of the probative value of the evidence with the potential for undue prejudice. The district court ultimately concluded the challenged evidence was "not unduly prejudicial. It will not bring about a wrong result and it does not outweigh the probative value."

Our court reviews for abuse of discretion a district court's decision that the probative value of evidence outweighs the potential for producing undue prejudice. *Boysaw*, 309 Kan. ___, 2019 WL 1746858, at *9. An abuse of discretion occurs when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based

on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based. 2019 WL 1746858, at *9.

Although the plain language of K.S.A. 2018 Supp. 60-455(d) appears to permit the admission of prior bad acts evidence without requiring a weighing of probative values versus prejudice, our Supreme Court has established safeguards limiting the introduction of K.S.A. 2018 Supp. 60-455 evidence generally. In particular, the material fact that the evidence is introduced to prove must be disputed, and the probative value of the evidence must outweigh its potential for producing undue prejudice. 2019 WL 1746858, at *9-10.

Moreover, our Supreme Court has favorably cited *United States v. Benally*, 500 F.3d 1085, 1090-91 (10th Cir. 2007), for its analytical approach to weighing the probative verses prejudicial effect of prior sex crime evidence. See *Boysaw*, 2019 WL 1746858, at *10; *State v. Prine*, 297 Kan. 460, 478, 303 P.3d 662 (2013). This test provides:

> "In evaluating the probative value of evidence of other crimes or civil wrongs, the district court should consider, among other factors: how clearly the prior act was proved; how probative the evidence is of the material fact sought to be proved; how seriously disputed the material fact is; and whether the government can obtain any less prejudicial evidence. In evaluating the possible prejudicial effect of evidence of other crimes or civil wrongs, the district court should consider, among other factors;  the likelihood that such evidence will contribute to an improperly based jury verdict; the extent to which such evidence may distract the jury from the central issues of the trial; and how time consuming it will be to prove the prior conduct. [Citation omitted.]" *Boysaw*, 2019 WL 1746858, at *10.

In conducting the probative verses prejudice assessment in the present case, the district court used this federal test. We will also follow this analytical approach.

*How clearly the prior acts have been proven.*

With regard to this first factor, the district court found that Alexander's prior acts "have been clearly proved by the State in its evidence of the defendant's voluntary admission and description to Detective Waite of his acts against the children, including his acceptance of responsibility by way of pleading guilty in 91 CR 179." It is undisputed that the prior acts were primarily proven through Alexander's admissions made during his interview with Detective Waite.

*How probative the evidence is of the material fact it is admitted to prove.*

The district court found the challenged evidence was "particularly probative in that it specifically, perpetually, and logically proves the defendant's propensity to commit crimes of a similar nature, a propensity that he has acted upon for the last 48 years."

Alexander argues that his prior acts were not similar to the acts he was charged with because some acts involved a girl and other acts involved a different act of "jacking off" young boys; all the prior acts occurred years apart from each other, sometimes as long as decades in between; and the prior bad acts did not happen frequently because they were about 5 to 10 years apart.

Upon our review, we find substantial competent evidence supports the district court's determination as to this factor. The acts were similar because the victims were prepubescent young boys and a girl, of a similar age, and the offending acts involved Alexander touching their genitals with his hand. As the district court noted, none of the acts involved oral sex or the victims lewdly touching Alexander. Moreover, Alexander knew all of the victims through family, neighbors, or friends. Finally, the repeated instances of sexual misconduct with young children over a long period of time shows Alexander's marked predisposition to commit the crimes for which he was charged.

20

*How seriously disputed is the material fact.*

The district court found that Alexander had pled not guilty to the charges and disputed the facts supporting the charges. This defense called into question whether any touching of W.B. or R.M. was accidental or unknowing—a claim that Alexander specifically made with regard to W.B. during his interview with Detective Waite. On appeal, Alexander does not directly address this factor. We conclude this factor was applicable and weighed in favor of admitting the prior acts evidence.

*Whether the State can avail itself of any less prejudicial evidence.*

After reviewing the State's evidence, the district court "looked at other aspects of this case to see if there were other ways in which the State could prove these facts that would meet that test, and the State is meeting that fourth factor. There are no less prejudicial ways to prove that." Alexander counters that the State did not establish any necessity for the prior acts evidence.

We find no error in the district court's evaluation of this factor. The prior acts were introduced through Alexander's own words or through certified court documents. The fact that the crimes alleged against W.B. and R.M. were unwitnessed also resulted in the need for the State to present the prior acts evidence.

In summary, applying the federal four-part test for weighing probative evidence, we are persuaded that the district court did not abuse its discretion in concluding that the prior acts evidence was highly probative.

21

*Evaluating the possible prejudicial effect.*

In evaluating whether the probative value of the prior acts evidence outweighed the possible prejudice, the district court concluded that the evidence "is not unduly prejudicial. It will not bring about a wrong result and it does not outweigh the probative value." It is apparent that the prior acts evidence was not time consuming because it was primarily admitted through Alexander's brief interview disclosures and the limited testimony of R.M. and his father. Under the totality of circumstances, the district court's legal conclusion regarding the prejudicial effect of the evidence is supported by the evidence.

In conclusion, we hold the district court applied the correct legal standards in evaluating the admissibility of the prior acts of sexual misconduct evidence. Accordingly, we find no abuse of discretion in the district court's admission of the 60-455(d) evidence.

FAILURE TO GIVE A K.S.A. 2018 SUPP. 60-455(d) LIMITING INSTRUCTION

On a related issue, Alexander asserts that because due process provides that a defendant may not be convicted solely upon propensity evidence, the district court erred by failing to provide a limiting instruction appropriately advising the jury about the evidence admitted under K.S.A. 2018 Supp. 60-455(d). The State counters that Alexander's request is without any support in Kansas law.

Our standard of review provides: "If the appellant failed to properly object to the instruction in the trial court, the standard on appeal is whether the instruction was clearly erroneous." *State v. Moyer*, 306 Kan. 342, 365, 410 P.3d 71 (2017).

Although Alexander's counsel objected to the admission of the 60-455(d) evidence, his counsel did not request a limiting instruction below. As a result, we review

22

this issue under the clearly erroneous standard. In determining whether the district court clearly erred in failing to give the limiting instruction, this court first must decide whether the instruction was legally and factually appropriate under an unlimited review of the entire record. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

In support of his argument, Alexander cites to a California case, *People v. Falsetta*, 21 Cal. 4th 903, 920, 89 Cal. Rptr. 2d 847, 986 P.2d 182 (1999), wherein the California Supreme Court rejected the notion that prior sexual acts evidence violates due process. The court did provide, however, that "*at the defendant's request*, the jury may be told that evidence of his other sexual offenses is not sufficient by itself to prove his commission of the charged offense." (Emphasis added.) 21 Cal. 4th at 920. By its plain language, *Falsetta* does not require such a limiting instruction, it only permits such an instruction if requested by the defendant. Of course, as acknowledged by Alexander on appeal, he did not request this particular limiting instruction—or any other limiting instruction—regarding 60-455(d) evidence at trial.

In its brief, the State appropriately views the jury instructions given in this case as a whole and asserts that a limiting instruction on propensity evidence is unnecessary:

> "*Falsetta* notwithstanding, there is no need to issue such an instruction when the instructions issued by the court, considered as a whole, sufficiently conveyed the same information to the jury. The jurors were instructed that it was their role to determine the weight and credit to be given the testimony of each witness, that the State had the burden to prove defendant guilty beyond a reasonable doubt, and that they were to decide each charge separately on the evidence and law applicable to it. In addition, the jurors were expressly instructed on the elements that the State had to prove in order to establish guilt of the charged offenses. Only by ignoring these instructions could the jurors have convicted defendant solely upon propensity evidence. It is presumed that jurors follow instructions issued by the district court absent any clear indication to the contrary. *State v. Becker*, 290 Kan. 842, 856, 235 P.3d 424 (2010)."

23

We agree with the State that *Falsetta* does not support Alexander's legal argument and that the jury instructions submitted in this case necessarily eliminated any potential for the jury to convict Alexander solely on propensity evidence.

Finally, the district court informed both parties at the instruction conference that, under *Prine*, a limiting instruction is not required for evidence admitted under 60-455(d). We agree. *Prine* definitively declared: "When evidence of another act or offense of sexual misconduct is admitted under K.S.A. 2009 Supp. 60-455(d) in a sex crime prosecution, the district judge need not give a limiting jury instruction." 297 Kan. 460, Syl. ¶ 4. Given that our Supreme Court has directly ruled on this issue, we conclude the district court did not err as a matter of law by not providing the jury with a limiting instruction on propensity evidence.

PROPRIETY OF INSTRUCTION NO. 6

Alexander contends the district court erred in its definition of "lewd" as stated in Instruction No. 6 which pertained to the aggravated indecent liberties charge with R.M. as the victim.

At the instruction conference, the district court asked the parties to pay close attention to the wording in Instruction No. 6. The district court made this request because, as explained in Instruction No. 8, the elements of the crime changed after the incident involving R.M. and before the incidents involving W.B. As a result, proof of the crimes involving R.M. in Instruction No. 6 were slightly different than those involving W.B. in Instruction Nos. 4 and 5. Moreover, the definition of "lewd" in Instruction No. 6—which Alexander now complains of—was different than the definition of "lewd" in Instruction Nos. 4 and 5.

24

Instruction No. 6 set forth the elements of the crime of aggravated indecent liberties with a child, R.M., and also set forth the following definition:

> "'Lewd fondling or touching' means fondling or touching in a manner which tends to undermine the morals of the child, which is so clearly offensive as to outrage the moral senses of a reasonable person, *and which is done with the specific intent to arouse or satisfy the sexual desires of either the child or the offender or both.* Lewd fondling or touching does not require contact with the sex organ of one or the other." (Emphasis added.)

Although Alexander now complains that the italicized language of Instruction No. 6 was erroneous, during the instruction conference his counsel had a different legal position. The district court asked the parties if there was any objection to the instruction and defense counsel replied: "*Defense is requesting the Court's proposed instruction number six.* We are not objecting and *we are requesting it.*" (Emphasis added.)

On appeal, Alexander now claims the instruction was improper because the definition of "lewd" was not legally appropriate since it allowed the jury to use Alexander's mental state to determine whether the touching of R.M. was lewd. Alexander asserts the jury should have been allowed to determine if the acts were objectively lewd and had it been given a proper instruction, it is possible the jury would have returned a different verdict.

On the other hand, the State argues that because Alexander specifically asked for Instruction No. 6 to be provided to the jury, the defendant invited the error. As a result, our court may decline to consider this issue for the first time on appeal. Additionally, the State contends that recent Kansas caselaw has upheld the propriety of the definition of lewd as found in Instruction No. 6.

25

We will first consider whether to apply the invited error doctrine. "Whether the invited error doctrine applies is a question of law over which this court has unlimited review." *State v. Sasser*, 305 Kan. 1231, 1235, 391 P.3d 698 (2017). As a general rule, on appeal, a defendant may not complain about a claimed error that the defendant invited. 305 Kan. at 1235. Of particular importance in this case, under the invited error doctrine, a defendant may not challenge an instruction on appeal, even as "clearly erroneous under K.S.A. 22-3414(3), when there has been an on-the-record-agreement to the wording of the instruction at trial." *State v. Pepper*, 294 Kan. 377, 393, 276 P.3d 148 (2012).

In the case on appeal, the district court clearly informed both parties that Instruction No. 6, relating to R.M., contained different language than Instruction Nos. 4 and 5 relating to W.B. In fact, the district court explicitly stated that Instruction No. 6 included language regarding Alexander's mental state. As noted earlier, Alexander's attorney made *two* requests for the district court to submit the instruction to the jury.

On appeal, Alexander speculates that his counsel was not aware that Instruction No. 6 included the mental state language in the definition of "lewd" because the parties did not specifically discuss it. But both parties had copies of the proposed Instruction No. 6 at the instruction conference. The district court specifically directed the parties to carefully read the instruction. Alexander's counsel did not indicate any confusion or seek clarification of the language in Instruction No. 6. Finally, the difference in language between Instruction No. 6 and Instructions Nos. 4 and 5 was further highlighted in Instruction No. 8, which Alexander's counsel also did not object to submitting to the jury.

Alexander cites our opinion in *State v. Hargrove*, 48 Kan. App. 2d 522, 547, 293 P.3d 787 (2013), for the proposition that "an invited error of constitutional import in a jury instruction should not be immune from review on direct appeal if defense counsel requested the instruction through inadvertence and without strategic designs. To hold otherwise would deprive an accused of individual fairness." But, unlike *Hargrove*,

26

Alexander has not raised or argued a constitutional claim in either his appellant's opening brief or reply brief. He simply complains that the definition of "lewd" was "legally inappropriate." Issues not adequately briefed are deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Alexander has failed to raise or argue a specific constitutional claim with regard to Instruction No. 6 and, thereby, show how *Hargrove* would preclude application of the invited error doctrine.

We are persuaded that the invited error doctrine applies under these circumstances. Given defense counsel's two requests to the district court to provide the jury with Instruction No. 6, it is apparent that even if Instruction No. 6 was clearly erroneous, given Alexander's on-the-record requests for this instruction, the invited error doctrine precludes appellate review. See *Pepper*, 294 Kan. at 393.

For the sake of completeness, however, we will address the merits of Alexander's argument.

We begin with a brief summary of our standards of review. In analyzing claims of jury instructional error, we first determine whether the question is properly before our court. In this regard, we determine whether there is either a lack of jurisdiction or if the question was properly preserved at the lower court. See *State v. Williams*, 295 Kan. 506, 517, 286 P.3d 195 (2012). An instructional error that is not properly preserved is reviewed for clear error. K.S.A. 2018 Supp. 22-3414(3).

Given that Alexander not only did not object to Instruction No. 6 but requested it, any error would be reversible only if the error is clearly erroneous. In reviewing for clear error, the court must first determine whether the instruction was erroneous. This is a legal question subject to de novo review. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). To determine whether a jury instruction was erroneous, we analyze whether the instruction was legally and factually appropriate. See *State v. Plummer*, 295 Kan. 156,

168, 283 P.3d 202 (2012). Under the clearly erroneous standard, if the appellate court determines the instruction was erroneous, reversal is required if the court is firmly convinced the jury would have reached a different verdict without the error. The question of reversibility is viewed in light of the entire record and subject to unlimited review. Finally, the party asserting clear error has the burden to establish it. *Betancourt*, 299 Kan. at 135.

Alexander claims the definition of "lewd" as found in Instruction No. 6 does not accurately state Kansas law. This claim is based on Alexander's reading of our Supreme Court's opinion in *State v. Ta*, 296 Kan. 230, 290 P.3d 652 (2012). Of note, the definition of "lewd" as found in Instruction No. 6 mirrors the challenged instruction in *Ta*. Alexander asserts the phrase, "and which is done with the specific intent to arouse or satisfy the sexual desires of either the victim or the offender or both," is an inaccurate statement of law based on *Ta*.

At the outset, the challenged language derives from PIK Crim. 3d. 53.00 (2007 Supp.) which was based on our Supreme Court's holding in *State v. Wells*, 223 Kan. 94, 98, 573 P.2d 580 (1977). In *Ta*, our Supreme Court disapproved of the use of the defendant's mental state to define lewd fondling or touching which was included in the *Wells* definition of lewd fondling or touching. In particular, the court determined that the *Wells* court conflated two elements of the crime of indecent liberties—lewd touching and the specific intent to arouse sexual desires. In *Ta*, our Supreme Court concluded:

> "In summary, a defendant's mental state should not be used to define or
> determine whether a touching is lewd. We, therefore, clarify *Wells* and hold that whether
> a touching is lewd should be determined by considering the common meaning of the term
> 'lewd,' that is whether a touching is 'sexually unchaste or licentious; suggestive of or
> tending to moral looseness; inciting to sensual desire or imagination; indecent, obscene,
> or salacious.' In considering if a touching meets this definition, a factfinder should
> consider whether the touching 'tends to undermine the morals of a child [and] . . . is so

28

clearly offensive as to outrage the moral senses of a reasonable person.' Any contrary language in *Wells* is overruled. [Citations omitted.]" *Ta*, 296 Kan. at 242-43.

In the present case, the district court's inclusion of the specific intent language in the definition of lewd touching in Instruction No. 6 appears contrary to the holding in *Ta*. But two years after the decision in *Ta*, our Supreme Court approved the language employed in this jury instruction to define lewd touching. In *State v. Reed*, 300 Kan. 494, 499-500, 332 P.3d 172 (2014), our Supreme Court specifically stated that the language was "[c]onsistent with Kansas law." Of note, *Reed* did not involve a challenge to the jury instruction itself, but the Supreme Court approved a definition including the specific intent language.

Our court has had two opportunities to address this seeming inconsistency in *Ta* and *Reed*. In *State v. Rios-Baltazar*, No. 110,921, 2015 WL 4879021 (Kan. App. 2015) (unpublished opinion), we concluded that because our Supreme Court in *Reed* held that the definition was consistent with Kansas law, there was no error in giving the instruction. Our court also relied on the fact that the definition of "lewd" was based on a then-current version of a PIK instruction. *Rios-Baltazar*, 2015 WL 4879021, at *8.

More recently, our court considered the same issue in *State v. Toole*, No. 116,522, 2017 WL 6395897, at *4 (Kan. App. 2017) (unpublished opinion). In *Toole*, our court adopted the analysis of *Rios-Baltazar* noting the holding in *Reed*, and concluding that, as a result, "we find no clear error in including the language regarding specific intent." *Toole*, 2017 WL 6395897, at *4.

We find *Toole* and *Rios-Baltazar* are persuasive in concluding that there was no clear error in the district courts' providing the challenged instructions to the respective juries.

29

However, assuming that Alexander has, in fact, shown error, we next proceed to analyze whether there was clear error under the circumstances. In other words, are we firmly convinced the jury would have reached a different verdict without the error? *Betancourt*, 299 Kan. at 135.

In considering this question, we begin by observing that the problem identified in *Ta* was that the inclusion of the specific intent language in the definition of lewd touching could allow a jury to rely solely on the defendant's specific intent to determine whether the touching was lewd, and not the nature of the act itself. 296 Kan. at 242-43. This possibility was especially acute in *Ta*, given that the defendant's prohibited conduct was simply touching the children's face, hair, legs, and arms. Under the challenged instruction, any touching—however innocent—could be lewd so long as the defendant intended the touch to be lewd. 296 Kan. at 242.

The danger identified in *Ta*, however, is not present under the case facts on appeal. R.M. testified that Alexander first touched his private area over his clothes and then placed his hand underneath his clothes and directly touched his penis for five minutes. As Alexander candidly concedes: "Unlike *Ta*, this is evidence that would likely be sufficient to support a finding of lewd touching." It is very apparent that the touching described by R.M. was "'sexually unchaste or licentious; suggestive of or tending to moral looseness; inciting to sensual desire or imagination; indecent, obscene, or salacious.' [Citation omitted.]" See 296 Kan. at 242-43. This touching was clearly lewd under the definition adopted in *Ta*. Moreover, this objective conclusion is separate and distinct from any specific intent harbored by Alexander at the time the touching occurred.

In summary, assuming the district court erred in providing the jury with Instruction No. 6, we hold that Alexander has failed to demonstrate the necessary prejudice to establish clear error. See *McLinn*, 307 Kan. at 318. We are not firmly

30

convinced that the jury would have reached a different verdict if the instructional error had not occurred. See 307 Kan. at 318.

Affirmed.